MARY WALKENHORST ET AL., APPELLANTS, V.
STATE OF NEBRASKA, DEPARTMENT OF ROADS, APPELLEE.

573 N.W. 2d 474

Filed February 13, 1998.    No. S-96-436.

William J. Morris and Cheryl L. Adams, of Nelson Morris & Titus, for appellants.

Don Stenberg, Attorney General, and Jeffery T. Schroeder for appellee.

CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

WRIGHT, J.

## STATEMENT OF CASE

In this eminent domain action, the State of Nebraska, through its Department of Roads, acquired fee title and temporary and permanent easements to part of the condemnees' property. The Madison County Court awarded the condemnees $15,340. On appeal to the Madison County District Court, a jury returned a verdict in the amount of $9,991. The condemnees have timely appealed from that verdict.

## SCOPE OF REVIEW

A condemnation action is reviewed as an action at law, in connection with which a verdict will not be disturbed unless it is clearly wrong. *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996).

A trial court's ruling in receiving or excluding an expert's opinion which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Id.*

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by said rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996).

## FACTS

The condemnees claim they were inadequately compensated for land taken by the State. Mary Walkenhorst, Dale Walkenhorst, Margaret Olson, Marvin Olson, and Morris Moyer each own an undivided one-sixth interest in the land

involved herein. Eunice Moyer may hold a life estate as to an undivided one-half interest in the land, and George H. Moyer, Jr.; Marilyn Moyer; Jon M. Moyer; Ann M. Long; and Steve A. Long each hold an undetermined interest in the land. Tim Sunderman is a tenant on the land.

The condemnees own two quarter sections of land in Madison County, Nebraska. The land is separated by U.S. Highway 81, which runs north and south. The land is a farm composed of pastureland and cultivated cropland. The land east of Highway 81 included a shelterbelt containing six rows of trees which extended for approximately ½ mile, as well as a home, barn, cribs, and yards suitable for conducting cattle raising and feeding operations. The land was once fenced on all four sides, and there are stock wells, tanks, and catch pens on each quarter section.

On February 22, 1994, through its power of eminent domain, the State acquired two strips of the condemnees' property in order to reconstruct Highway 81. The State acquired 8.24 acres on the east side of the highway and 1.78 acres on the west side of the highway. In this condemnation, the State seized 10.02 total acres of land in fee title, acquired three permanent easements totaling .29 acres and a temporary easement of .36 acres, and obtained control of access to the condemnees' remaining property. Additionally, a fence on the west side of the condemnees' property had to be torn down, and the State built the condemnees a new access road.

At trial, witnesses for the condemnees were Jon Moyer, one of the owners; Richard Walsh, a licensed engineer; James Brogan, an abstractor; and Doug Reigle, one of the farm tenants. Ronald Lumb, a forester, was not permitted to testify in front of the jury, and the condemnees offered his testimony as an offer of proof, which was overruled.

The jury returned a verdict of $9,991. Following trial, the condemnees' motion for new trial was overruled. The condemnees appealed, and a petition to bypass the Nebraska Court of Appeals was granted by this court.

## ASSIGNMENTS OF ERROR

In summary, the condemnees assert that the district court erred in (1) excluding their evidence regarding the value of trees

as a shelterbelt and timber, and the value of the trees as related to the fair market value of the land taken and the diminution in value to the land remaining; (2) excluding their tendered jury instructions referring to impairment of access caused by the taking and to the value of the trees and the cost of replacing fencing; and (3) admonishing the jury to disregard their counsel's closing argument regarding the cost of repairing the access roads.

## ANALYSIS

The condemnees argue that a shelterbelt of trees located on property taken by the State constitutes property separate and apart from the land and that Neb. Const. art. I, § 21, entitles them to compensation for the shelterbelt in addition to any compensation granted for the taking of the land. In the alternative, the condemnees claim they have not been compensated by the State for the value of the shelterbelt as it relates to the value of the land taken and the diminution in value of the land remaining after the shelterbelt was removed.

In *Lincoln Branch, Inc. v. City of Lincoln*, 245 Neb. 272, 512 N.W.2d 379 (1994), we held that a plaintiff in an eminent domain case is entitled to recover the fair market value of property taken, as well as any decrease in the fair market value caused by a governmental taking. See, also, NJI2d Civ. 13.01. The general rule is that consequential damages are not recoverable in eminent domain cases. See 29A C.J.S. *Eminent Domain* § 117 (1992). However, Nebraska is an exception to this rule because article I, § 21, provides: "The property of no person shall be taken or damaged for public use without just compensation therefor." In Nebraska, " 'not only is the condemnor liable to compensate for the taking but also . . . by virtue of section 21, art. I of [our] Constitution . . . for consequential damage to other property in excess of the damage sustained by the public at large. . . .' " See *Patrick v. City of Bellevue*, 164 Neb. 196, 205, 82 N.W.2d 274, 280 (1957).

In *Leffelman v. City of Hartington*, 173 Neb. 259, 262, 113 N.W.2d 107, 109 (1962), we referred to the proper measure of damages pursuant to article I, § 21, by stating: " ' "The words, 'or damaged,' in Article I, section 21, of the Constitution of Nebraska, include all actual damages resulting from the exer-

cise of the right of eminent domain which diminish the market value of private property." ' " Thus, we recognized that it is the diminution in market value which establishes the damages under article I, § 21, and that "consequential damage" defines the kind of damage that is compensable under article I, § 21; it does not define the measure of damages. See, also, NJI2d Civ. 13.08 comment. We have consistently held that the damages in an eminent domain case are measured based on market value, whether it be fair market value of the property actually acquired or the decrease in market value of the remaining property.

There are three generally accepted approaches used for the purpose of valuing real property in eminent domain cases: (1) the market data approach, or comparable sales method, which establishes value on the basis of recent comparable sales of similar properties; (2) the income, or capitalization of income, approach, which establishes value on the basis of what the property is producing or is capable of producing in income; and (3) the replacement or reproduction cost method, which establishes value upon what it would cost to acquire the land and erect equivalent structures, reduced by depreciation. Each of these approaches is but a method of analyzing data to arrive at the fair market value of the real property as a whole. *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996).

In *Westgate Rec. Assn.*, we stated that although we had not heretofore adopted the unit rule by name, we had demonstrated a preference for valuing condemned property as a whole, citing *Y Motel, Inc. v. State*, 193 Neb. 526, 227 N.W.2d 869 (1975), and *Medelman v. Stanton-Pilger Drainage Dist.*, 155 Neb. 518, 52 N.W.2d 328 (1952). "[T]he unit rule is applicable whenever the market data approach is employed . . . and . . . this rule requires that the value of improved property be considered as a whole, without the assignment of separate costs for the land and individual improvements . . . ." *Westgate Rec. Assn.*, 250 Neb. at 20, 547 N.W.2d at 493.

In *Westgate Rec. Assn.*, we recognized that methods of valuation other than market data may be used in certain circumstances. Citing *Iske v. Metropolitan Utilities Dist.*, 183 Neb. 34, 157 N.W.2d 887 (1968), we held that capitalization of income

of rentals from a reasonably prospective use of the property was an acceptable method of arriving at present market value. We have also recognized that generally, the reproduction cost method as an independent test of value is used only in rare cases where there is a lack of comparable sales of similar property, the structures on the property are in some sense unique, or the character of the improvements is unusually well adapted to the kind of land upon which they are located. *Westgate Rec. Assn. v. Papio-Missouri River NRD, supra.*

In *Heye Farms, Inc. v. State*, 251 Neb. 639, 558 N.W.2d 306 (1997), we reiterated that the measure of damages for partial takings of land is the market value of the land taken and the difference in value of the remainder before and after the taking. In considering the effect of severance on the market value of the remainder, account must be taken of all of the inconveniences caused by the severance as they might affect a prospective purchaser and the effect of the severance upon every available, reasonable, and probable future use of the property, as it relates to the market value of the remainder of the property considered as a unitary whole.

Thus, the condemnees' claim that they should be compensated separately for the value of the trees is without merit, for vegetation is generally not to be valued separately and then added to the value of the underlying land in a summation approach. See 4 Julius L. Sackman, Nichols on Eminent Domain § 13.09[1] (rev. 3d ed. 1997). See, also, *Medelman v. Stanton-Pilger Drainage Dist., supra.* The condemnees cannot be compensated for the value of the shelterbelt as a shelterbelt; instead, the only relevant inquiry is how the presence of the shelterbelt on the condemned land affects the fair market value of the land taken. See, *Dawson v. Dept. of Transp.*, 203 Ga. App. 157, 416 S.E.2d 163 (1992); *State Roads Comm'n v. Toomey*, 302 Md. 94, 485 A.2d 1006 (1985); *County of Muskegon v Bakale*, 103 Mich. App. 464, 303 N.W.2d 29 (1981).

In the alternative, the condemnees argue that they should have been compensated for the value of the shelterbelt, as it enhanced the value of the land taken and diminished the value of the land not taken. They allege that there are no recent sales

of property remotely similar to the property taken from them by the State. Relying upon *Graceland Park Cemetery Co. v. City of Omaha*, 173 Neb. 608, 114 N.W.2d 29 (1962), they claim that their property has no determinable fair market value because of this absence of comparable sales. In *Graceland Park Cemetery Co.*, we recognized that certain types of property are not bought and sold on an open market and, consequently, do not have a recognizable fair market value. We reasoned that when the fair market value of such property is not obtainable, some other formula of fixing the value of the property must be devised.

Here, the condemnees' property is farmland containing a shelterbelt of trees, and therefore, an alternate valuation method does not need to be used. The shelterbelt is not of such a unique nature as to render use of the fair market value standard unjust, to render the determination of the market value impossible, or to require use of one of the other valuation methods described in *Westgate Rec. Assn. v. Papio-Missouri NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996). In another Nebraska eminent domain case involving a shelterbelt, the market data approach had been utilized to estimate the fair market value of the land taken and the value of the land remaining. See *Chaloupka v. State*, 176 Neb. 746, 127 N.W.2d 291 (1964). Therefore, we reject the condemnees' recommendation that we adopt a special valuation approach under these circumstances.

Claiming that neither Lumb, a forester, nor Jon Moyer, one of the condemnees, was allowed to testify as to the value of the shelterbelt taken by the State, the condemnees argue that Lumb and Jon Moyer would have provided evidence of the value of the trees as they enhanced the value of the land taken and as to how their loss diminished the value of the property that remained. The condemnees assert that had Lumb been allowed to testify, he would have told the jury that the unit value of the trees growing on the land taken was $25,000, i.e., $80,000 for the value of 350 trees minus depreciation plus sawlog value of the cottonwood trees.

The State objected to Lumb's testimony, which objection was sustained on the grounds that the testimony was an improper measure of damages, it was unrelated to the fair market value of the land, and proper foundation had not been laid. In an offer of

proof, Lumb gave his opinion as to both the value of the shelterbelt and the value of the shelterbelt as used on the land at the time of the taking. The offer was overruled. The condemnees argue that Lumb's testimony should have been presented to the jury because Lumb stated that the value he attributed to the shelterbelt was directly related to its value on the condemned land and because using replacement value for the trees was not an improper measure of damages.

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by said rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Westgate Rec. Assn., supra.* It is within the trial court's discretion to determine if there is sufficient foundation for a witness to give his opinion about an issue in question. A trial court's ruling in receiving or excluding an expert's opinion which is otherwise relevant will be reversed only when there has been an abuse of discretion. To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about evidence admitted or excluded. *Koehler v. Farmers Alliance Mut. Ins. Co.*, 252 Neb. 712, 566 N.W.2d 750 (1997).

Expert testimony concerning the measure of damages in an eminent domain action must be tied to the market value of the property remaining before and after the acquisition. "[A]n expert witness, when properly qualified, may testify as to the valuation of the property . . . ." *Patterson v. City of Lincoln*, 250 Neb. 382, 388, 550 N.W.2d 650, 655 (1996). For the testimony of an expert or lay witness to be admissible on the question of market value of real estate, the witness must be familiar with the property in question and the state of the market. *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996).

Lumb was not asked to testify regarding how the presence of the shelterbelt enhanced the market value of the property. Lumb testified that he believed the use of a tree affected the fair market value of that tree. He also testified that the trees located on the condemnees' land protected the land from wind erosion and protected the livestock from wind. However, when Lumb was asked to attribute a value to the trees, he did not relate this value

to the fair market value of the land. Instead, he began with the replacement cost of the trees and, therefore, used an improper measure of damages. Thus, the district court did not abuse its discretion when it ruled that the condemnees had not laid proper foundation for Lumb's testimony regarding the value of the trees.

The condemnees also assert that it would be unfair for them not to be allowed to introduce evidence regarding the value of the trees taken, because the State's witness testified that he believed the trees had no value whatsoever. However, the State's valuation of the trees was not introduced as a separate item of damage. The State's appraiser testified as to what effect he believed the presence of the trees had on the fair market value of the condemned land and, thus, used the proper measure of damages. Accordingly, the district court did not abuse its discretion when it excluded Lumb's testimony.

The condemnees' claim that Jon Moyer was not allowed to testify regarding how the trees affected the fair market value of the land taken is also without merit. Jon Moyer was not asked to render an opinion regarding whether the fair market value of the condemned land was affected by the presence of the shelterbelt. Thus, the condemnees' assertion that the district court precluded Jon Moyer from introducing this evidence is not supported by the record.

The second aspect of the measure of damages is how a partial taking affects the fair market value of the remaining land. In *Laube v. Estate of Thomas*, 376 N.W.2d 108, 109 (Iowa 1985), the Iowa Supreme Court noted that where trees are "put to a special purpose, such as for windbreaks, shade or ornamental use, the measure [of the value of condemned land] is usually the difference in value of the realty before and after the destruction of the trees." See, also, *Miss. State Highway Com'n v. Viverette*, 529 So. 2d 896 (Miss. 1988); *State Roads Comm'n v. Toomey*, 302 Md. 94, 485 A.2d 1006 (1985); *State, Department of Highways v. Burleigh*, 160 So. 2d 782 (La. App. 1964); *Walters v. Iowa Elec. Co.*, 203 Iowa 471, 212 N.W. 884 (1927). Therefore, evidence of the value of the lost trees is relevant, but such evidence must be related to the fair market value of the land in order to be admissible.

Lumb was never asked to render an opinion regarding the effect which the loss of the shelterbelt would have on the fair market value of the remaining property. His testimony was limited to the replacement cost of the trees only and failed to relate the value of the trees to the fair market value of the remaining land. Therefore, Lumb's testimony was properly excluded. Conversely, Jon Moyer did testify that he believed there was a diminution in the value of the remaining land caused by the loss of the shelterbelt. Jon Moyer opined that the fair market value of the land on the east side of the highway was $600 per acre before the taking and that the value of the remainder was only $450 per acre. Therefore, contrary to the condemnees' assertion, Jon Moyer did give an opinion concerning the market value of the remaining property.

On redirect, Jon Moyer was asked what factors he considered in valuing the land on the east side of the property before and after the taking. The State's objection to this testimony was sustained, and the condemnees argue that the district court abused its discretion by excluding this evidence. Error may not be predicated upon a ruling of a trial court excluding testimony of a witness unless the substance of the evidence to be offered by the testimony was made known to the trial court by an offer of proof or was apparent from the context of the testimony. *State v. Cortis*, 237 Neb. 97, 465 N.W.2d 132 (1991); *State v. Bennet*, 2 Neb. App. 188, 508 N.W.2d 294 (1993). The substance of what Jon Moyer would have testified to is not apparent from the context of the testimony, and the condemnees made no offer of proof of the factors that Jon Moyer was prohibited from discussing. Thus, the record does not indicate how Jon Moyer's testimony on redirect would have varied from his prior testimony that the remainder damages were related to the loss of the shelterbelt, and the condemnees have not sufficiently preserved this assignment of error for appeal.

The condemnees argue that the district court erred in excluding their testimony regarding whether the property west of the highway was devalued by loss of access. On redirect of Jon Moyer, the condemnees' counsel asked whether the property west of the highway was devalued in "any way by its access being limited or by its access being destroyed by this highway project." The State's objection that this question was beyond the

scope was sustained. The district court overruled the condemnees' offer of proof that Jon Moyer would testify that before access on the west side was limited, the property had an average value of $469 per acre, and that after access was limited, the property had a value of only $405 per acre.

The offer of proof was beyond the scope of the cross-examination, and the district court did not abuse its discretion in sustaining the objection. Although the content of the offer of proof alluded to what would have been a proper measure of damages of the value of the property before and after the taking, such evidence had not been explored on direct and had not been discussed on cross-examination. The offer of proof did not explain how these damages were to be considered by the jury or how this evidence related to the evidence introduced on cross-examination or during direct examination. The record is clear that the condemnees were attempting to introduce evidence as to damages because of limited access and because of diminution in market value. Since diminution in market value was never offered during direct and was not inquired into on cross-examination, the objection was properly sustained, and the district court did not abuse its discretion in overruling the offer.

The condemnees argue that the district court erred in excluding both of their tendered jury instructions referring to impairment of access caused by the taking and in excluding their tendered jury instructions referring to the value of the trees and the cost of replacing fencing. To establish reversible error from a court's refusal to give a requested instruction, the appellant has the burden to show that (1) the appellant was prejudiced by the court's refusal to give the tendered instruction, (2) the tendered instruction is a correct statement of the law, and (3) the tendered instruction is warranted by the evidence. *Rose v. City of Lincoln*, 234 Neb. 67, 449 N.W.2d 522 (1989). Regarding a claim of prejudice from an instruction given or a court's refusal to give a tendered instruction, the given instructions must be read conjunctively rather than separately in isolation. If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal. *Id.*

Instructions Nos. 5 and 7 given by the district court were patterned after NJI2d Civ. 13.01 and 13.02 respectively and state the law as recently set out in *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996), and *Lantis v. City of Omaha*, 237 Neb. 670, 467 N.W.2d 649 (1991). The general rule is that whenever applicable, the Nebraska Jury Instructions are to be used. *Tank v. Peterson*, 228 Neb. 491, 423 N.W.2d 752 (1988).

We find that the instructions given by the district court were based on the Nebraska Jury Instructions, were not misleading, and adequately covered the issues involved in this case. The condemnees have not shown that they were prejudiced by the jury instructions which were given. The record shows that the jury was allowed to consider the loss of trees, access, and fencing not as separate items, but generally as they affected the market value of the condemnees' property. Therefore, the condemnees were not prejudiced by the omission of their offered instructions, and the district court did not err in refusing to give the condemnees' requested instructions.

The condemnees note that the district court did not specifically instruct the jury regarding the alleged loss of access and the alleged diminution in fair market value caused by the loss of the trees and fence, and the condemnees claim that this was error. In *Heye Farms, Inc. v. State*, 251 Neb. 639, 647, 558 N.W.2d 306, 312 (1997), we specifically held that "while the condemnee may testify to and the jury may consider itemized burdens, the trial court is not required to instruct the jury on each individual item making up the condemnee's damages." Accordingly, the district court was not under an obligation to submit the jury instructions which the condemnees offered.

Finally, the condemnees argue that the district court erred in admonishing the jury to disregard their counsel's closing argument regarding the cost of repairing the access road. During closing arguments, the condemnees' counsel began discussing access and gave the cost estimate previously testified to by the engineer as an estimate of the damage caused by the loss of access. The State's objection to this figure was sustained as an improper itemization of damages. The estimated cost of repairing the loss of access was not properly related to the fair market value of the remaining land.

## CONCLUSION

Having considered all the condemnees' assignments of error and finding them to be without merit, we affirm the judgment of the district court.

AFFIRMED.

WHITE, C.J., participating on briefs.