STEPHEN R. SMITH AND DORIS SMITH, APPELLEES, V. PAPIO-MISSOURI RIVER NATURAL RESOURCES DISTRICT, APPELLANT.

576 N.W. 2d 797

Filed April 10, 1998.    No. S-95-376.

Paul F. Peters, of Schmid, Mooney & Frederick, for appellant.

Michael J. Mooney and Francie C. Riedmann, of Gross & Welch, P.C., for appellees.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, and GERRARD, JJ., and SPETHMAN, D.J., and GRANT, J., Retired.

GERRARD, J.

Stephen R. "Reed" Smith (Reed Smith) and Doris Smith sought and obtained further review in this court from the judgment of the Nebraska Court of Appeals in which it reversed a district court judgment based on a jury verdict in their favor and remanded the matter for a new trial. We conclude that the Court of Appeals erred in disturbing the jury verdict and, as such, reverse its judgment and remand the cause with the direction to reinstate the jury verdict and judgment entered in the district court.

## I. FACTS

On July 3, 1991, the Papio-Missouri River Natural Resources District (district) initiated an action to condemn a 21.22-acre tract of land owned by the Smiths located on the Boyer Chute of the Missouri River. The county board of appraisers awarded the Smiths $42,247.94 for the taking, and the Smiths appealed to the district court. Following a 4-day trial, a jury awarded the Smiths $127,500, and the trial court entered judgment in that amount.

The district appealed from the jury verdict, assigning several errors. In a decision not designated for permanent publication, the Court of Appeals held that the trial court abused its discretion when it allowed the Smiths to testify as to their opinions concerning the fair market value of their property and when it allowed the Smiths' real estate expert, Patrick Morrissey, to render his opinion concerning the value of the Smiths' property without proper and sufficient foundation. *Smith v. Papio-Missouri River NRD*, 96 NCA No. 34, case No. A-95-376 (not designated for permanent publication).

The Court of Appeals concluded that such opinions were predicated on insufficient foundation for two reasons. First, the opinions were based on the mistaken premise that the Smith property was suitable for residential use, and second, the value of the Smith property was improperly compared to the so-called Novy trade. As the record in this matter is quite voluminous, additional facts will be supplied as required for proper analysis of the assigned errors.

## II. STANDARD OF REVIEW

A condemnation action is reviewed as an action at law, in connection with which a verdict will not be disturbed unless it is clearly wrong. *Walkenhorst v. State*, 253 Neb. 986, 573 N.W.2d 474 (1998).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by said rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Id.*

A trial court's ruling in receiving or excluding an expert's opinion which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Id.*

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through the judicial system. *Kaminski v. Bass*, 252 Neb. 760, 567 N.W.2d 118 (1997); *Malicky v. Heyen*, 251 Neb. 891, 560 N.W.2d 773 (1997).

## III. ASSIGNMENTS OF ERROR

The errors assigned by the Smiths in their petition for further review are that the Court of Appeals erred in concluding that (1) the property at issue could not be used for residential purposes, (2) the Novy trade could not be considered a comparable sale for valuation purposes, and (3) the Smiths' opinions concerning the fair market value of their property were inadmissible.

Because of the Court of Appeals' disposition of this matter, it did not reach two errors assigned by the district below: The trial court erred in (1) allowing the Smiths to cross-examine the dis-

trict's real estate expert concerning real estate commission rates in Nebraska and (2) overruling the district's motion to vacate the verdict due to juror misconduct. For the purposes of our review, both assignments of error will be examined.

## IV. ANALYSIS

### 1. Admissibility of Opinion Testimony

#### (a) Evidence of Potential Residential Use

The Court of Appeals concluded that

> there is *no evidence* to support Stephen Smith's assertions that a part of his property was outside of the floodway at the time of the taking and that there is *no evidence* to support a finding that there was any reasonable probability that the Smiths could have obtained the right to build a residence on the tract.

(Emphasis supplied.) *Smith v. Papio-Missouri River NRD*, 96 NCA No. 34 at 6. These conclusions are not supported by the record.

The land at issue, frontage property along a spring-fed portion of the Boyer Chute, had been in the Smith family for about 60 years. Through the 1930's, Reed Smith's grandparents lived in a house on the property. Other structures located on the property during the 1930's included a barn, a chicken coop, and a machine shed. Reed Smith's grandparents moved into town in the 1940's, and the buildings were lost when the banks of the chute eroded later that decade. Reed and Doris Smith purchased the property from Reed Smith's grandfather in the late 1970's and, along with family and friends, have enjoyed the use of a portion of the property as a recreational area for picnics, fishing, and hunting. The rest of the property was cropland. The Smiths testified that they intended to one day build their retirement home on this land and supplement their income by operating a fishing-guide service and duck-hunting area. At the time of the taking, Reed Smith was 46 years old and planned to retire when he was 55 years old.

The evidence at trial established that the owners of property within a floodway may build a residence or other structure on their property only if they can establish either that the site where the structure will be built is not actually within the flood-

way but instead within the floodway fringe or that construction in the floodway will not impede the flow of water within the floodway.

At the time of taking, the Federal Emergency Management Agency (FEMA) map revealed that only a very small portion of the southwest corner of the Smith property might possibly lie in the floodway fringe. Reed Smith testified that according to the FEMA map, he estimated that a triangle-shaped portion of his property, approximately 90 feet by 190 feet, along the right angle of the triangle, was outside the floodway and within the floodway fringe.

Wayne Kirk, a registered land surveyor and former surveyor and flood plain administrator for Washington County, testified that the FEMA floodway maps are computer-generated models that are inaccurate as to the actual elevations of land within a floodway. Kirk stated that anyone who wanted to build near a floodway was entitled to request a restudy of his or her property and revision of the FEMA floodway map. Kirk also testified that based on his survey of the area near the Smith property, the southern portion of the Smith property was out of the floodway. In addition, Doug Cook, planning administrator for Washington County, testified that a structure could be built within a floodway if it is certified that the structure is on an isolated portion of high ground.

The Smiths testified that the southern end of their property was high ground that historically had not been inundated during periods of flooding. Further, Reed Smith testified that he, along with the Omaha Public Power District and the Cottonwood Marina, requested a restudy and revision of the FEMA map with respect to their properties. According to Reed Smith, the revised FEMA map indicated that 5 to 6 acres of what was formerly his property were located outside of the floodway.

The Washington County board considered adoption of the revised FEMA map after the district had acquired the Smith property. Reed Smith testified that at the third county board meeting concerning the restudy, the board voted to table adoption of the revised FEMA map until the instant litigation was final. Cook testified that the district appeared at the third county board meeting in opposition to the adoption of the proposed

revisions to the FEMA map and requested that the board table the matter until the litigation between the district and the Smiths was completed.

The Smiths were required to prove the fair market value of their property in view of any reasonably probable use, reasonably occurring in the immediate future. See *Johnson v. Nebraska Public Power Dist.*, 187 Neb. 421, 191 N.W.2d 594 (1971). The Smiths did, in fact, adduce evidence to demonstrate that their valuation opinions, as well as the valuation opinion of their expert, were correctly based on the fact that it was reasonably probable that the Smith property could be used for residential purposes, reasonably occurring in the immediate future.

At the time of the taking, even the "inaccurate" FEMA map disclosed that a portion of the Smith property was within the floodway fringe and thus suitable for residential construction. The revised FEMA map revealed that at least one-quarter of the Smiths' property was outside the floodway and thus suitable for residential use. The revised FEMA map was corroborated by the survey conducted by Kirk and consonant with the Smiths' observations of the extent to which their property was inundated during periods of flooding.

The Court of Appeals placed some emphasis on the fact that the revised FEMA map did not have "official standing." While it is true that the FEMA map had not been adopted by the Washington County board, the only reason the revised FEMA map had not been adopted by the county board prior to the time of trial was because the district stood in opposition to its adoption. However, the record establishes that the district opposed adoption of the restudy map not because it questioned the accuracy of the map, but, instead, because the district complained that Reed Smith was without standing to request the restudy, as he was no longer the owner of affected property.

We therefore determine that the Court of Appeals erred in finding that there was no evidence to support the conclusion that it was reasonably probable that the Smith property could be used for residential purposes in the immediate future. The record before us is replete with evidence that supports the Smiths' assertion that a part of their property was outside of the floodway at the time of the taking and that it was reasonably

probable that the Smiths could obtain the right to build a residence on their land in the immediate future.

## (b) Novy Trade

The Court of Appeals concluded that the trial court erred by allowing the Smiths and their real estate expert, Morrissey, to consider the so-called Novy trade as a measure of the fair market value of the Smith property. The Novy trade involved an 18-acre tract of Missouri River frontage land near the Smith property and similar in many respects to the Smith property. John Novy, Jr., had at one time promised an adjoining landowner, Jess Wright, president of the Fort Calhoun Stone Company, a right of first refusal should Novy decide to sell his land. Although Wright intended to quarry the Novy property at some point in the future, his immediate interest in purchasing the Novy property was to limit the use of the road across his land to only Novy and his family. This road through Wright's quarry provided the best access to the Novy property.

According to Wright, sometime in 1993, Novy told Wright that an unidentified third party had offered $150,000 for his property. Wright then agreed to purchase the property from Novy. For their mutual tax advantage, they structured the exchange as a trade of land with yet another third party. This exchange was valued by Wright and Novy at $150,000. Since Wright did not intend to quarry the Novy land at the time, he granted Novy and his daughter a 20-year life estate to continue to use the property for recreational purposes.

The district's real estate expert, Kenneth Beckstrom, testified that Novy told him that the exchange was valued at $150,000 because that was the cost of the land Novy wanted to acquire and that it was not the result of an independent third-party offer on Novy's Missouri River property.

The Court of Appeals concluded that because Novy reserved for himself a life estate in the recreational attributes of his property and since it is these recreational attributes that are claimed to be similar to the Smith property's, the exchange cannot be considered a sale for the equivalent of cash suitable for comparison to the Smith land. *Smith v. Papio-Missouri River NRD*, 96 NCA No. 34, case No. A-95-376 (not designated for permanent publication).

This conclusion, however, does not take into account the fact that the fair market value of the land exchanged was not established as the result of negotiations between Novy and Wright. Fair market value is the price which property will bring when offered for sale upon the open market as between a willing seller and buyer, neither being obligated to buy or sell. See, *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996); *Lincoln Branch, Inc. v. City of Lincoln*, 245 Neb. 272, 512 N.W.2d 379 (1994).

Construing the evidence in favor of the Smiths, we find the fair market value of Novy's property, $150,000, was established on the open market through an offer from a third-party willing buyer not obligated to buy and made to a willing seller not obligated to sell. Wright merely matched the independent third party's offer. Thus, Novy's retention of a life estate in the recreational attributes of the property and Wright's desire to limit access to the Novy property across his land are irrelevant. The value of the exchange arose from negotiations independent of the negotiations which allowed Novy to retain a life estate and Wright to limit access to the road through his quarry. The retention of a life estate in the recreational attributes of the property, as well as Wright's ability to limit access across his quarry property, had no bearing whatsoever on the fair market value of the exchange.

In eminent domain proceedings where the sales prices of other tracts are offered as evidence of market value of the tract taken, a wide discretion must be granted the trial judge in determining the admissibility of the evidence of the other sales. The evidence should not be admitted where there is a marked difference in the situation of the properties. *Patterson v. City of Lincoln*, 250 Neb. 382, 550 N.W.2d 650 (1996); *McArthur v. Papio-Missouri River NRD, supra*. Generally, evidence as to the sale of comparable property is admissible as evidence of market value, provided there is adequate foundation to show the evidence is material and relevant. The foundation evidence should show the time of the sale, the similarity or dissimilarity of market conditions, the circumstances surrounding the sale, and other relevant factors affecting the market conditions at the time. *Heye Farms, Inc. v. State*, 251 Neb. 639, 558 N.W.2d 306 (1997); *Patterson v. City of Lincoln, supra*.

We conclude that the trial court did not abuse its discretion when it allowed the Smiths and Morrissey to base their opinions as to the fair market value of the Smith property on the sale or exchange of the Novy property. Not only did the Smiths adduce evidence demonstrating that the Novy trade was a fair market exchange valued at $150,000, but they adduced additional evidence as to other factors which demonstrated that there was not a marked difference in the situations of the Smith and Novy properties.

For example, evidence was adduced that demonstrated that the Smith and Novy properties were similar in that both were approximately 20-acre riverfront tracts, with about half of the acreage tillable ground and the rest primarily enjoyed for its recreational attributes. The tracts differed in that the Novy land was on the Missouri River and the Smith property was on the Boyer Chute. Reed Smith opined that this difference made his property better. The tracts also differed in that the Novy land was completely in the floodway whereas the Smith property was not. However, Novy had a cabin on his land whereas the Smith land did not have any already-constructed, habitable buildings.

The Smith property had access via a county road, had a boat ramp, and was suitable for duck hunting. The Novy property had none of these attributes. Finally, the Novy property was situated directly across the river from Wilson's Island, an Iowa recreation area. Reed Smith testified that the noise from Wilson's Island would be a negative attribute compared to his property. These differences are not factors which would render a comparison for the purposes of valuation inadmissible, as they do not demonstrate a marked difference in the situation of the properties. Instead, such differences go toward the weight to be accorded such testimony, not its admissibility.

Further, the Novy trade cannot be thought of as too remote in time to be considered a comparable exchange. An appraisal must be made near enough in point of time to furnish a test of the market value as of the date in question and is a matter within the discretion of the trial court. *Schmailzl v. State*, 176 Neb. 617, 126 N.W.2d 821 (1964).

The Novy trade occurred around July 1993, approximately 2 years after the district filed its condemnation action against the

Smiths. Morrissey testified that there was no need to make an adjustment merely because the Novy trade was 2 years later in time than the taking by the district. The test is whether the sale has probative value with respect to the present value. See 8A Patrick J. Rohan & Melvin A. Reskin, Nichols on Eminent Domain § 27.02[1] (rev. 3d ed. 1997). The district's expert, Beckstrom, likewise examined the Novy trade and did not conclude that this transaction was too remote, but instead concluded that Wright was under duress to purchase the property at whatever price Novy demanded. Thus, the trial court did not abuse its discretion, based on remoteness, by allowing into evidence the Novy trade.

The conclusion of the Court of Appeals that the Novy trade was not a comparable sale is in error. The fair market value of the Novy property was established in an arm's-length negotiation between a willing seller and buyer, neither obligated to buy or sell. Novy's retention of a 20-year life estate in the recreational attributes of the property was unrelated to this negotiation. There is no support in the record for the assertion that the Novy trade was too remote for consideration as a comparable sale. Moreover, the various similarities and differences between the properties should not bear on the admissibility of the Novy trade as evidence of a comparable sale and, thus, fair market value. Instead, all the evidence presented in this regard should properly be considered by the jury as to the weight to give to a witness' opinion of fair market value.

(c) Resolution

An owner of real property shown to be familiar with the value of such land is a competent witness to testify as to its value for the use to which it is then being put, without additional foundation. *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996). In order for the testimony of either an expert or a lay witness to be admissible on the question of market value of real estate, the witness must be familiar not only with the property in question, but also with the state of the market. *Id.*

The Smiths testified only as to their opinions of the fair market value of their property for the use to which it was then being

put. There is sufficient evidence in the record indicating that the Smiths could have used their property for residential purposes in the immediate future, as a portion of their property sufficient for use as a residence either was within the floodway fringe or was high ground within the floodway. Accordingly, the trial court did not abuse its discretion when it allowed the Smiths to offer valuation opinions. As such, the Court of Appeals erred in holding to the contrary.

## 2. ERRORS ASSIGNED BELOW BUT NOT REACHED

Because of its disposition of this case, the Court of Appeals did not address two errors assigned by the district. We must now address those assignments, as a proper result will not be reversed merely because it was reached for the wrong reasons. *Klinginsmith v. Wichmann*, 252 Neb. 889, 567 N.W.2d 172 (1997); *Boettcher v. Balka*, 252 Neb. 547, 567 N.W.2d 95 (1997).

The district assigned as error below the trial court's failure to sustain the district's relevance objection to the cross-examination of its expert in regard to real estate commission rates. A review of the record indicates that the Smiths' counsel questioned the district's expert, Beckstrom, in regard to his knowledge of the commission rate a buyer would pay to a real estate agent. In its proper context, this questioning was elicited in an attempt to impeach Beckstrom's credibility as a real estate market expert. As such, this line of questioning was relevant. No objection was made as to unfair prejudice. Thus, the trial court did not abuse its discretion in allowing such testimony. Accordingly, this assignment of error, assigned by the district but not decided by the Court of Appeals, is without merit.

The district also assigned error in regard to the trial court's failure to sustain the district's motion to vacate the verdict due to purported juror misconduct. During a recess in the trial, a juror went to the Washington County assessor's office in order to inquire about a 40-acre parcel of land south of Blair that he was interested in purchasing. The juror asked three office employees their opinion as to how much it would cost to purchase a portion of the property. The office employees told the juror that a 10-acre parcel would go for around $3,500 to $4,000 per acre and that anything over 20 acres tends to be less.

The juror testified that he did not inquire about the Smith property. The juror also testified that he did not share this information with the other jurors.

Allegations of misconduct by jurors must be substantiated by competent evidence. *Hartley v. Guthmann*, 248 Neb. 131, 532 N.W.2d 331 (1995); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). The misconduct complained of must relate to a disputed matter that is relevant to the issues in the case and must have influenced the jurors in arriving at the verdict. *Nichols v. Busse, supra.* The trial court's ruling on a question involving jury misconduct will not be disturbed on appeal absent an abuse of discretion. *Id.*

At trial, the Smiths' real estate expert valued the Smith property in the range of $4,000 per acre. Thus, the value of the land that the juror was considering was arguably relevant to an issue in the case, that being, the value of the Smith land. However, the property the juror was interested in was distant from the Smith and Novy properties. Further, the property the juror inquired about was not farmland, nor was it riverfront property. The juror did not tell any other juror what he had learned at the county assessor's office. The juror went to the county assessor's office purely for personal reasons and made no inquiry as to the Smith or Novy properties.

We conclude that the district has failed to substantiate its charge of juror misconduct with competent evidence. The record reflects that the juror did not seek information from the county assessor's office in an attempt to either corroborate or impeach testimony offered at trial with respect to a disputed matter. Instead, the juror, acting solely in his own self-interest, took the opportunity to ask employees of the county assessor's office some questions concerning a parcel of property in which he was interested.

Further, the property in which the juror was interested is not similar in any manner to the Smith property. The property that the juror was interested in is so markedly dissimilar to the Smith and Novy properties that it could never be considered a comparable sale for the purposes of determining the fair market value of the Smith property. Thus, the district's final assignment of error is without merit.

## V. CONCLUSION

Having concluded that the Court of Appeals erred in disturbing the jury verdict, we reverse the judgment of the Court of Appeals and remand the cause with the direction that the verdict and the district court judgment rendered thereon be reinstated.

REVERSED AND REMANDED WITH DIRECTION.