751 N.W.2d 608 (2008)
276 Neb. 23
LIBERTY DEVELOPMENT CORPORATION, a Nebraska corporation, Appellee and Cross-Appellant,
v.
METROPOLITAN UTILITIES DISTRICT OF OMAHA, a municipal corporation and political subdivision of the State of Nebraska, Appellant and Cross-Appellee.
No. S-07-582.
Supreme Court of Nebraska.
July 3, 2008.
*611 Daniel G. Crouchley and Susan E. Prazan, Omaha, for appellant.
David A. Domina, of Domina Law Group, P.C., L.L.O., Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

I. NATURE OF CASE
The county court for Douglas County appointed three appraisers who awarded Liberty Development Corporation (Liberty) $55,000 as damages for the taking of easements by the Metropolitan Utilities District of Omaha (MUD). Liberty filed a petition for review in the district court for Douglas County, and a jury awarded Liberty $750,000. MUD appealed, and the Nebraska Court of Appeals summarily dismissed the appeal for lack of jurisdiction. We granted further review.

II. SCOPE OF REVIEW
A jurisdictional question that does not involve a factual dispute is a matter of law that requires an appellate court to reach an independent conclusion irrespective of the determination made by the court below. In re Interest of Fedalina G., 272 Neb. 314, 721 N.W.2d 638 (2006).
It is within the trial court's discretion to determine whether there is sufficient foundation for an expert witness to give his opinion about an issue in question. Curry v. Lewis & Clark NRD, 267 Neb. 857, 678 N.W.2d 95 (2004). A trial court's ruling in receiving or excluding an expert's opinion which is otherwise relevant will be reversed only when there has been an abuse of discretion. Id.
A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters *612 submitted for disposition through the judicial system. Smith v. Papio-Missouri River NRD, 254 Neb. 405, 576 N.W.2d 797 (1998).

III. FACTS

1. JURISDICTIONAL BACKGROUND
MUD is a municipal corporation and political subdivision of the State of Nebraska operating as a natural gas and water facility in the Omaha metropolitan area. Liberty is a corporation whose shareholders are David and Robin Broekemeier. Liberty purchased and developed land referred to as the "Ranch View Estates 2" subdivision, which included the property subject to MUD's easements.
After MUD was unable to purchase the easements from Liberty, it filed a petition in the county court for Douglas County to acquire permanent and temporary construction easement rights for the public purpose of constructing, maintaining, and operating water mains as a part of its water distribution system. The particular easement parcels were selected due to their proximity to MUD's "Skyline Reservoir" and future "Platte West Treatment Plant." MUD would allow the easements to be covered with things such as concrete or asphalt, fencing, and landscaping, except trees, so long as such coverings did not unreasonably interfere with MUD's use and enjoyment of its easement rights. MUD requested that the court appoint three disinterested appraisers from Douglas County to assess the damages which Liberty would sustain by MUD's acquisition of temporary and permanent easement rights in Liberty's properties.
The easements crossed the length of the Ranch View Estates 2 subdivision, a new residential subdivision in Elkhorn, Nebraska, developed and owned by Liberty. At the time MUD filed its petition, the land had been graded and planted to grass. Streets and sewers had been built, but the subdivision was vacant of homes. The permanent easements were located on Lots 1, 13, 14, 27, 28, 40, 41, 52, and 77 through 86, as well as Outlot A, totaling 1.486 acres. The temporary construction easements were located on the same lots and totaled 1.654 acres.
Neither the necessity of the taking nor the authority to take the property was disputed. The amount of compensation was the sole issue. The county court appointed three disinterested appraisers to assess the damages Liberty would sustain by reason of the acquisition of the permanent and temporary easements. After reviewing and inspecting the lots in question, the appraisers filed an award in the county court for Douglas County in the amount of $55,000 for temporary and permanent easement rights acquired by MUD through condemnation. The appraisers found that the permanent easements resulted in damages of $37,500 and that the temporary construction easements resulted in damages of $17,500.
Liberty timely filed with the county court its notice of intent to appeal the award of the appraisers to the district court. Liberty also filed with the county court a certificate of service stating that it had served MUD's assistant general counsel with a copy of the notice of appeal and a praecipe for transcript. The signature of Liberty's attorney was on the certificate of service.
The case was tried to a jury, and on November 6, 2006, the district court for Douglas County entered judgment on the verdict. On the same day, the case was mistakenly dismissed via an "Order of Dismissal on Progression." On November 13, Liberty moved for prejudgment interest, attorney fees, and witness fees. MUD moved for a new trial. Presumably, neither party knew that the case had been dismissed. When Liberty realized this *613 fact, it moved to set aside the dismissal. On January 3, 2007, the district court vacated the order of dismissal and reinstated the case. The court noted that the dismissal had been made by a different judge and that the dismissal was based on "an incorrect computer calendar in the Clerk's Office."
On April 3 and 24, 2007, the district court awarded attorney fees, witness fees, and prejudgment interest to Liberty. MUD's motion for new trial was overruled, and it appealed on May 18. On October 17, the Court of Appeals summarily dismissed the cause for lack of a final order.

2. JURISDICTIONAL ANALYSIS
Before proceeding to the merits, we address the jurisdictional issue decided by the Court of Appeals and a jurisdictional issue raised by MUD on appeal.

(a) Court of Appeals Jurisdictional Issue
The parties agree that the Court of Appeals erroneously dismissed the appeal for lack of a final order. However, because the parties cannot confer jurisdiction upon this court by either acquiescence or consent, we review the issue of jurisdiction below. See Cummins Mgmt. v. Gilroy, 266 Neb. 635, 667 N.W.2d 538 (2003).
In its petition for further review, MUD asserted that the Court of Appeals erred in concluding the district court did not have jurisdiction when it entered judgment on the jury verdict. The progression order which dismissed the case was dated November 1, 2006. The verdict of the jury was delivered November 2. Both of these orders were file stamped November 6. Because neither order was effective until it was file stamped by the clerk of the district court, both orders were effective on November 6. In the absence of a showing to the contrary, we conclude that the district court had jurisdiction at the time it entered the jury verdict. To conclude that the court dismissed the case and then entered the jury verdict would create an anomaly. It would be an odd and unjust result if a jury verdict was not entered because another judge had erroneously dismissed the case before the verdict could be entered. In the case at bar, the order of dismissal was an error by a judge who was unfamiliar with the fact that the case had recently been tried and a verdict entered.
The district court did not enter any other judgments or orders before it formally reinstated the case on January 3, 2007. Therefore, all orders from which MUD's appeal was taken were properly entered by the district court. Accordingly, the decision of the Court of Appeals which dismissed MUD's appeal pursuant to Neb. Ct. R. of Prac. 7A(2) (rev. 2001) is reversed. We conclude that MUD's notice of appeal was timely and that we have jurisdiction of the matter.

(b) District Court Jurisdictional Issue
MUD claims that Liberty did not properly perfect its appeal from the award in the Douglas County Court. MUD raised the issue in its reply brief before this court.
On December 12, 2002, Liberty filed a notice of appeal in the Douglas County Court from the appraisers' $55,000 award. Attached to this notice was a certificate of service. MUD claims that Liberty did not correctly file a proof of such service as required by Neb.Rev.Stat. § 76-715.01 (Reissue 2003) and that, therefore, the district court did not acquire jurisdiction of the appeal.
The manner of perfecting an appeal to the district court from an award by appraisers in a condemnation proceeding is governed by § 76-715.01, which provides:
The party appealing from the award for assessment of damages by the appraisers in any eminent domain action *614 shall, within thirty days of the filing of the award, file a notice of appeal with the court, specifying the parties taking the appeal and the award thereof appealed from, and shall serve a copy of the same upon all parties bound by the award or upon their attorneys of record. Service may be made by mail, and proof of such service shall be made by an affidavit of the appellant filed with the court within five days after the filing of the notice stating that such notice of appeal was duly mailed or that after diligent search the addresses of such persons or their attorneys of record are unknown.
(Emphasis supplied.)
Liberty timely filed a notice of appeal in the Douglas County Court. However, instead of an affidavit as proof of service of the notice of appeal, Liberty filed a "Certificate of Service." MUD claims the failure to file an affidavit as proof of service of the notice was jurisdictional and that Liberty therefore did not perfect its appeal to the district court.
MUD argues that Wooden v. County of Douglas, 16 Neb.App. 336, 744 N.W.2d 262 (2008), controls this jurisdictional question. We disagree. In Wooden v. County of Douglas, 275 Neb. 971, 751 N.W.2d 151 (2008), the issue was whether the timely filing of the affidavit of proof of service was necessary to vest the district court with jurisdiction of the condemnation appeal. The Court of Appeals had concluded that the timely filing of such affidavit was jurisdictional. We reversed because we concluded that the timely filing of such an affidavit was directory and, therefore, not jurisdictional. In the case at bar, the notice of appeal was timely filed and the proper parties were served with the notice of appeal.
Having determined that all lower courts and appellate courts were properly vested with jurisdiction, we proceed to the merits of the appeal before us.

IV. ASSIGNMENTS OF ERROR
MUD claims the district court erred (1) in failing to limit evidence of damages to the difference in the fair market value before and after the taking, (2) in allowing Liberty's expert to testify without proper foundation, and (3) in denying MUD's motion for new trial.

V. FACTS REGARDING MERITS OF APPEAL
Installation of water mains on the subject property commenced March 31, 2003. Construction of both the 42- and the 54-inch water mains was completed no later than September 30. MUD's engineer testified that except on Lot 1, the 54-inch water main that ran along Ranch View Drive was located entirely in the public right-of-way and that the 42-inch water main was located both on the private easement and the public right-of-way.
David Broekemeier (hereinafter Broekemeier), a co-owner of the development, testified that out of 110 lots in the subdivision, he had 68 lots contracted for sale at the time of the taking and that subsequently, only 18 closed. He attributed the failure to sell the 50 lots to the easements. He stated that the average price for those lots was $60,000 and that he had sold only 31 lots since the taking. Broekemeier also testified the development had been held up by MUD's failure to service the area with 8-inch water mains. Broekemeier claimed he could not sell the lots without water, because the power company would not service the area before the water mains were in place.
Ason Okoruwa, a certified appraiser, testified on behalf of Liberty. On direct examination, Okoruwa stated that he had determined the market value for the lots in *615 the subdivision before the easements were taken. He testified that in this particular case, the installation of the water mains vastly affected the market value of the lots on which the water mains were located, as well as adjoining lots. He ascertained the effect on the lots from "research" and from talking to Broekemeier, who indicated that he lost 50 presales as soon as the purchasers became aware of the water mains.
Okoruwa testified that given Liberty could not sell those lots, he had to estimate what were the damages caused by the taking. If there was a low market value for residential lots, the highest and best use changed. He concluded that before the taking of the easements, the highest and best use of the property was residential, and that afterward, it became recreational, park, or open space. He then subtracted the recreational value of the lots from their residential value, and the difference was his estimate of damages.
The record indicates Okoruwa testified that the damages to the property actually taken by the permanent easements were $206,000. He opined that the damages to the balance of the lots upon which the easements were located were $892,000. Thus, according to Okoruwa, the total damages to the lots upon which the easements were located were $1,098,000.
Okoruwa then testified to the damages to the lots directly adjacent to the permanent easements. The before value of the lots directly adjacent to the lots with permanent easements was $657,000. He opined their value after the easements was $89,000. This amount reflected a difference of $568,000, which Okoruwa stated was the damages caused to the lots that were adjacent to the permanent easements.
Okoruwa then gave his opinion as to the damages caused by the temporary easements. He stated that because of the temporary construction easements, Liberty could not sell any of the lots for at least 1 year. He proceeded to determine what he considered was the appropriate rental rate for the lots in the subdivision because they could not be sold. He concluded that the reasonable rental rate, or rate of return, for 1 year on the land was 15 percent. This rate applied to the value of all the lots that were off the market for at least 1 year, which, according to Okoruwa, was the entire subdivision. Okoruwa testified that the value before the construction of the temporary easements was $2,159,000 and that the value after was $1,877,000. The difference of $282,000 was the amount he attributed as damages to the subdivision for being taken out of the market for at least 1 year.
MUD objected to Okoruwa's testimony on the basis of foundation, arguing that Okoruwa was relying on statements made to him about effects and events that took place after the taking. MUD's objections were overruled.
Okoruwa was then asked to total all the damages about which he testified. He was directed to exclude from his total the amount of any damage that might have been calculated for lots to the south of those described in his testimony. He stated that the damages were $2,418,000. He opined this was the sum that should be awarded to Liberty to compensate it for the takings. MUD's objection based on lack of proper and sufficient foundation was overruled.
Thomas Stevens, an appraiser for MUD, testified that the highest and best use of Liberty's property was single-family residential. He stated that in his 40 years of experience in the appraisal business, he had not seen an impact on valuation of a property due to the presence of a water main. He valued the permanent easements at $32,500 and the temporary easements at $17,500.

*616 VI. ANALYSIS
The measure of damages for the taking of an easement is the difference between the reasonable market value of the property before and after the taking of the easement. In re Petition of Omaha Pub. Power Dist., 268 Neb. 43, 680 N.W.2d 128 (2004). Damages for the taking of a permanent easement and a temporary construction easement are measured as of the date of taking. See Langenheim v. City of Seward, 200 Neb. 740, 265 N.W.2d 446 (1978). The date for determining valuation and damages in eminent domain proceedings is the date the condemnor files its petition in condemnation in the county court. See Platte Valley Public Power & Irr. Dist. v. Armstrong, 159 Neb. 609, 68 N.W.2d 200 (1955).
The basis for Liberty's evidence concerning its measure of damages was Broekemeier's testimony that prior to the condemnation, Liberty had 68 lots sold and that after the condemnation, it lost 50 sales. MUD claims that the district court erred in allowing such evidence because it was irrelevant to the proper measure of damages. It claims that the record contains numerous instances where the court allowed evidence regarding the market value of the property which was not computable as of October 2, 2002, the date MUD filed its petition for condemnation.
MUD argues that Okoruwa's testimony lacked sufficient foundation because it relied upon Broekemeier's assertion that he lost 50 presales after the condemnation. It argues that the loss of sales was irrelevant and that the district court abused its discretion in allowing this testimony.
MUD also asserts that the district court erred by admitting evidence of damages to the lots not affected by the easements. Liberty claimed that the sale of lots in the entire subdivision was adversely affected due to the installation of the water mains. Okoruwa testified regarding damages to lots adjacent to the lots with easements.
Okoruwa stated that the before value of the lots directly adjacent to the lots with the permanent easements was $657,000 and that their value after the taking was $89,000. He calculated the damages related to the difference in market value before and after the taking of lots adjacent to the easements at $568,000. This was despite the fact that five of these lots (Lots 2, 12, 15, 16, and 29) had been sold for full value at the time of the proceedings and none of the easements touched these lots.
It is fundamental that the plaintiff's burden to prove the nature and amount of its damages cannot be sustained by evidence which is speculative and conjectural. Clearwater Corp. v. City of Lincoln, 202 Neb. 796, 277 N.W.2d 236 (1979).
There are three generally accepted approaches used for the purpose of valuing real property in eminent domain cases: (1) the market data approach, or comparable sales method, which establishes value on the basis of recent comparable sales of similar properties; (2) the income, or capitalization of income, approach, which establishes value on the basis of what the property is producing or is capable of producing in income; and (3) the replacement or reproduction cost method, which establishes value upon what it would cost to acquire the land and erect equivalent structures, reduced by depreciation. Each of these approaches is but a method of analyzing data to arrive at the fair market value of the real property as a whole.
Walkenhorst v. State, 253 Neb. 986, 991, 573 N.W.2d 474, 480(1998).
For the testimony of an expert or lay witness to be admissible on the question of market value of real estate, the witness must be familiar with the property *617 in question and the state of the market. Id. Okoruwa purported to testify to the before and after values of lots subject to the easements using the market data and comparable sales methods. However, the record reflects that his testimony did not meet the necessary foundational requirements concerning the effect that the easements had on the value of the lots.
Okoruwa testified that the installation of the water mains "vastly affected the market values" of the lots. He stated he obtained that information from Broekemeier and "[f]rom research." Broekemeier told Okoruwa that 50 sales were lost as soon as purchasers became aware of the water mains and that Liberty had sold only 31 lots in the 4 years since the taking. Okoruwa attributed the failure of the sales to the easements.
Okoruwa did not set forth the method or "research" he used to determine the value of the lots subject to the taking. His basis for determining that the highest and best use of the lots had changed from residential to recreational was because Broekemeier had lost presales. Because Broekemeier could not sell these lots, Okoruwa concluded that the lost sales were caused by the easements.
When asked how he estimated the damage, Okoruwa said that if there was a low market for residential lots, the highest and best use changed. Because there was a low market for these lots, he stated the use of the lots changed from residential to recreational or open space. His foundation for this opinion was Broekemeier's claim that he had lost some 50 contracts. There was no evidence that Okoruwa had researched any comparable properties subject to similar easements or conducted any market data analysis of the highest and best use of similar properties.
Moreover, Okoruwa did not testify that he had confirmed with any of the alleged prepurchasers that the contracts were actually lost due to the easements. On cross-examination, Okoruwa admitted that he "did not find comparable sales with aqueducts on them" and that he did not rely on any studies or publications relating to water mains to determine Liberty's damages. He concluded that the lots adjacent to the lots with easements changed in value from residential to recreational. Therefore, he valued all of these lots as recreational. He had no comparable sales for this change in valuation.
Okoruwa also concluded that because of the temporary construction easements, Broekemeier could not sell all the lots for at least I year. Okoruwa relied on this fact to determine the damage from the temporary easements. Since the lots could not be sold for at least 1 year, he computed a reasonable rate of return on the property at 15 percent. He applied this computation to the entire subdivision. Over MUD's objection, the district court permitted Okoruwa to testify that the rental value of the property before the temporary easements was $2,159,000 and the value after was $1,877,000a difference of $282,000.
When real property is temporarily taken by eminent domain, the value of compensation is determined by one of several methods: (1) ascertaining the value of the property for the period it is held by the condemnor, (2) ascertaining the difference in the value of the property before and after the taking, or (3) looking at the fair market rental value of the property during the time it was taken. 4 Julius L. Sackman, Nichols on Eminent Domain § 12E.01[1] (rev. 3d ed. 2007), citing David Schultz, The Price is Right! Property Valuation for Temporary Takings, 22 Hamline L.Rev. 281 (1998).
Okoruwa concluded that because of the temporary construction easement. Liberty could not sell those lots and that those *618 lots could not be marketed for at least 1 year. He proceeded to determine what he opined as the appropriate rental rate for those lots because they could not be sold. He concluded that a reasonable rate of return of 15 percent applied to the value of all the lots that could not be sold, which was basically the whole subdivision. Over MUD's objection, Okoruwa stated: "The value before was $2,159,000, and the value after, $1,877,000, and the difference [$]282,000." This was "[t]he damage to the subdivision for taking out the whole subdivision from the market for at least one year."
The evidence was undisputed that the temporary construction easements were located on only the 19 lots that were subject to the permanent easements. However, applying a rate of return for the whole subdivision was the equivalent of claiming the whole subdivision was part of the temporary easement, which, in fact, involved only 1.654 acres.
The valuation of permanent easements is a difficult task, and the valuation of temporary easements is even more difficult. See 9 Patrick J. Rohan & Melvin A. Reskin, Nichols on Eminent Domain § G32.08[1][a] (rev. 3d ed. 2007). In the case at bar, Okoruwa attempted to value the temporary easements in terms of a rate of return for the entire property based upon rental value of the property before and after the temporary easements. In effect, he opined that the damages for the temporary taking of 19 lots for the temporary construction easements was $282,000. We conclude that it was error for the district court to allow such testimony.
On direct examination, Okoruwa was asked to calculate the total of all damages about which he had testified. He opined that the total damages were $2,418,000. This was despite the fact that the damages he testified to on direct examination totaled only $1,948,000. Over MUD's objection as to proper and sufficient foundation, Okoruwa stated that this amount should be awarded to Liberty to compensate it for the takings.
Generally, evidence as to the sale of comparable property is admissible as evidence of market value, provided there is adequate foundation to show the evidence is material and relevant. Wear v. State of Nebraska, 215 Neb. 69, 337 N.W.2d 708 (1983), citing Clearwater Corp. v. City of Lincoln, 202 Neb. 796, 277 N.W.2d 236 (1979). The foundation evidence should show the time of the sale, the similarity or dissimilarity of market conditions, the circumstances surrounding the sale, and other relevant factors affecting the market conditions at the time. Id. Whether properties, the subject of other sales, are sufficiently similar to the property condemned to have some bearing on the value under consideration, and to be of aid to the jury, must necessarily rest largely in the sound discretion of the trial court. Wear v. State of Nebraska, supra, citing Langfeld v. Department of Roads, 213 Neb. 15, 328 N.W.2d 452 (1982).
Okoruwa's opinions lacked sufficient foundation, and the district court abused its discretion in admitting Okoruwa's testimony. Except for Lot 1, which had an additional 50-foot easement, the permanent easements were 20 to 25 feet in width on each lot and totaled 1.486 acres. The temporary construction easements on each lot was 20 to 30 feet in width and totaled an additional 1.654 acres. Okoruwa's conclusion that the easements changed the highest and best use of the property from residential to recreational was without sufficient foundation. His testimony as to Liberty's damages was therefore speculative and conjectural.

*619 VII. CONCLUSION
The order of the Court of Appeals that dismissed the appeal is reversed. The trial court erred in admitting Okoruwa's testimony. We therefore reverse the judgment and remand the cause for a new trial. Liberty's motion for attorney fees is denied, and its cross-appeal is dismissed.
REVERSED AND REMANDED FOR A NEW TRIAL.