RICHARD L. GORDON, APPELLANT, V. COMMUNITY FIRST STATE BANK, FORMERLY THE ABBOTT BANK, ET AL., APPELLEES.

587 N.W. 2d 343

Filed December 4, 1998. Nos. S-97-618, S-97-1183.

D.C. Bradford, of Bradford, Coenen & Welsh, for appellant.

Terence P. Boyle, of Boyle Partnership, P.C., and J. Michael Coffey, of Stave & Coffey, for appellee Community First State Bank.

Joseph K. Meusey, Joseph E. Jones, and Michael J. Mooney, Jr., of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellees Chapin, Raum, Keslar, and Willnerd.

Don Stenberg, Attorney General, and Fredrick F. Neid for appellees Hansen, Glen, and Plummer.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

STEPHAN, J.

In this consolidated action, Richard L. Gordon seeks damages from Community First State Bank, formerly The Abbott Bank (Bank), and several of its officers, as well as the director and two other employees of the Nebraska Department of Banking and Finance (Department). Gordon asserts alternative theories of recovery, including abuse of process and denial of civil rights in violation of 42 U.S.C. § 1983 (1994). The district court for Douglas County sustained demurrers and entered an order of dismissal in each action, from which Gordon appeals. We conclude that we lack jurisdiction over Gordon's appeal in case No. S-97-618 with respect to the individual appellees because there is no final, appealable order as to them. We affirm the judgment in that case with respect to the Bank, and we affirm the judgment in case No. S-97-1183 in its entirety.

## I. SCOPE OF REVIEW

An order sustaining a demurrer will be affirmed if any one of the grounds on which it was asserted is well taken. *Parker v. Lancaster Cty. Sch. Dist. No. 001*, 254 Neb. 754, 579 N.W.2d 526 (1998); *Lawry v. County of Sarpy*, 254 Neb. 193, 575 N.W.2d 605 (1998).

In considering a demurrer, a court must assume that the facts pled, as distinguished from legal conclusions, are true as alleged and must give the pleading the benefit of any reasonable inference from the facts alleged, but cannot assume the exis-

tence of facts not alleged, make factual findings to aid the pleading, or consider evidence which might be adduced at trial. *Id.*

When a demurrer to a petition is sustained, a court must grant leave to amend the petition unless it is clear that no reasonable possibility exists that amendment will correct the defect. *Vanice v. Oehm*, 255 Neb. 166, 582 N.W.2d 615 (1998); *State ex rel. Wood v. Fisher Foods*, 254 Neb. 982, 581 N.W.2d 409 (1998).

## II. FACTUAL ALLEGATIONS

The operative petitions in both of these actions contain similar factual allegations, which we summarize here, recalling that we must assume the truth of such allegations under the aforementioned standard of review. The Bank is chartered by the State of Nebraska and maintains its principal place of business in Alliance, Nebraska. Approximately 99 percent of the Bank's outstanding common stock was owned by Abbott Bank Group, Inc. (ABGI), a bank holding company incorporated in Delaware. In June 1982, James E. Abbott became the majority shareholder of ABGI.

Prior to a reorganization which occurred between 1987 and 1989, Abbott's banking interests included 10 independent banks, each of which was owned by a separate holding company. In 1987, Abbott became chairman of each bank's board of directors. At that time, Gordon was a shareholder, director, and officer of an Omaha law firm which had represented the banking interests of Abbott and his family since 1978. Abbott designated Gordon as general counsel to the Abbott banks and their respective holding companies and gave Gordon broad authority to review all legal matters involving these entities. As general counsel, Gordon had an attorney-client relationship with the Bank which was founded on an oral contract.

Between 1987 and 1989, the 10 separate banks were reorganized into a single bank owned by ABGI, The Abbott Bank, resulting in the loss of each bank's local name, autonomy, and board of directors. In addition, the reorganization resulted in significant reductions in bank personnel. Gordon alleges that this reorganization created "extremely hard feelings" directed toward those perceived to be responsible for the changes, par-

ticularly Gordon and his law firm. As a part of the reorganization, the Bank instituted a credit card program, which met with resistance from the Bank's management. Also, various actions of the Bank taken to reform policies and collect delinquent accounts furthered animosity toward Abbott and his advisors.

In 1990, Gordon advised Abbott that unless issues regarding management and leadership were addressed, it was likely that the Bank's various professional fees would increase significantly. Rather than replace management, Abbott decided to pursue a sale or merger of the Bank into a larger organization in order to resolve the management issues and realize the value of the investment in the credit card operation. Abbott informed Gordon of this decision in confidence.

In 1993, Abbott retained an investment banking firm to assist in the sale of the Bank. He intentionally did not disclose this fact to some persons on the management team. In July, the decision to sell the Bank was disclosed to Richard J. Chapin, the chief financial officer of the Bank, who later became its president. Gordon alleges that Chapin pretended to support the decision while secretly planning to remove Abbott from controlling the Bank's policies and operations. Gordon alleges that Bank officers Darrell Raum, Pat Keslar, and Tom Willnerd conspired with Chapin (collectively referred to as "the individual officers") to remove Abbott from control of the Bank and place themselves in control. Gordon alleges that the individual officers determined that in order to carry out their plan, they had to first remove Gordon from his position as general counsel.

Gordon contends that in order to attract regulatory disapproval sufficient to cause Abbott's removal and block Abbott's plan to sell the Bank or control the terms of any sale, the individual officers (1) attacked the viability of the credit card operation, (2) attacked the ability of Abbott to set Bank policy and to counsel with Gordon, (3) attacked Gordon as having too much control over the affairs of the Bank, (4) attacked the financial condition of the Bank, (5) attempted to place the Bank in various conditions of default with its primary lender and regulators, (6) alleged that the Bank illegally paid Abbott's personal legal and accounting fees, (7) failed to timely produce a business plan for the Bank, (8) attacked the legal fees of

Gordon's law firm, (9) attacked the fees of the Bank's accounting firm, (10) attacked the fees of the Bank's advertising company, and (11) threatened to quit their respective services to the Bank unless regulators supported them in their efforts to " 'get rid of' " Abbott and Gordon.

Gordon alleges that in late 1993 and early 1994, the individual officers further conspired to take control of the Bank by forming a "joint plan or agreement with the intent of controlling the Bank so that any potential buyer would have to deal with them and thereby preserve their influence and jobs." He alleges that in December 1993, Chapin hired an attorney to represent the Bank without the knowledge or approval of the board of directors. Gordon alleges that the individual officers then began a series of discussions with state and federal banking regulators in which they made the following misrepresentations: (1) that the Bank had unlawfully permitted Gordon to act as an unlicensed Bank officer, (2) that the Bank was in a very perilous financial condition, and (3) that the Bank " 'was in imminent danger of failure.' "

Gordon alleges that on January 27, 1994, Chapin met secretly with Lucinda Glen and Kent Plummer of the Department, and that during this meeting Chapin told Glen and Plummer that the Bank was failing, although he had made no such statement to the Bank's primary lender and subsequently voted to approve the Bank's budget. According to Gordon, at some point between February 28 and March 10, Glen, Plummer, and James Hansen, director of the Department (hereinafter collectively referred to as "the state regulators"), and the individual officers agreed to work together in order to wrest control of the Bank from Abbott, remove Gordon from involvement with the Bank, restrict the sale of the Bank, and guarantee the continued employment of the individual officers. Gordon further alleges that at the time this agreement was made, the individual officers and the state regulators knew that the allegations made by the individual officers were false and that all acts taking place after March 9 were done to further the agreement.

Gordon contends that as a result of the individual officers' discussions with the state regulators, the Federal Deposit Insurance Corporation (FDIC) began an investigation which led

the Department to issue an emergency order pursuant to Neb. Rev. Stat. §§ 8-1,134 to 8-1,139 (Reissue 1991). The emergency order, issued March 10, 1994, provided that the Bank could not terminate any officer or force, require, or coerce any officer to resign without written approval from the Department and the FDIC. On March 11, the Department served a second emergency order on all officers and employees of the Bank, finding that Gordon was acting as an unlicensed executive officer, in violation of Neb. Rev. Stat. § 8-139 (Reissue 1991), and ordering the Bank to cease and desist from the practice of allowing Gordon to act in this manner. Gordon asserts that this action was meant to intimidate officers and employees of the Bank. Gordon further alleges that after the orders were issued, the individual officers began to pressure and intimidate other members of the Bank's executive committee.

Gordon requested a hearing regarding the emergency orders on March 18, 1994. He alleges that the Department sent a copy of the second order to the Omaha World-Herald newspaper. Gordon alleges that the emergency orders allowed the individual officers to have full control of the Bank without the "input or interference" of Abbott and to terminate the Bank's relationship with Gordon and his law firm. Gordon also asserts that the individual officers established a procedure that effectively prevented any Bank employee from having any contact with Gordon or his firm.

Gordon alleges that the state regulators took steps to prevent the discovery of facts that did not support the emergency orders. According to Gordon, no inquiries were made of Abbott, Gordon, Gordon's law firm, the Bank's accounting firm, or the Bank's board of directors. Gordon also states that the state regulators "took great pains" to prevent the company assisting with the possible sale of the Bank from presenting information that would conflict with the state regulators' position. Gordon further alleges that the Bank supported the actions of the state regulators and the individual officers and that these actions exposed Gordon to possible felony charges.

When Gordon appealed the second emergency order, Hansen, the director of the Department, appointed the Honorable John T. Grant, a retired member of this court, to act

as the hearing officer. Gordon alleges that although the Bank and the state regulators knew or should have known that any further prosecution was "reckless," they presented evidence to Justice Grant in an effort to keep the emergency order in effect. The Bank also filed pleadings admitting to the allegations that supported the emergency orders. This, according to Gordon, exposed him, the Bank, the Bank's board of directors, and Abbott to criminal prosecution. Gordon alleges that the Department continued to prosecute its actions against Gordon when it knew that no emergency existed. Justice Grant concluded that the Department failed to carry its burden of proof and recommended that the emergency orders be set aside.

In November 1994, The Abbott Bank entered into a merger agreement with Community First State Bank, which, Gordon alleges, proves that the efforts of the individual officers to prevent the sale were not successful and that the Bank was never in an emergency condition. However, in December, Hansen rejected Justice Grant's findings and drafted an order affirming the original cease-and-desist order. Gordon appealed this order to the district court for Lancaster County, which dismissed Gordon's appeal as moot without reaching a decision on the merits. In May 1995, Community First State Bank acquired The Abbott Bank for approximately $34 million and sold the Bank's credit card receivables for approximately $10 million.

### III. PROCEDURAL HISTORY

#### 1. CASE NO. S-97-618

In this action against the Bank and the individual officers, Gordon alleged that these parties "caused the issuance of process and abusively pursued its application to prevent Abbott from having the representation of his choice" with respect to the sale of the Bank. Gordon stated that the alleged abuse of process caused him to lose income, reputation, and the opportunity to practice law, for which he sought special damages in the amount of $10 million and general damages in an unspecified amount. Gordon also asserted alternative theories of recovery, against the individual officers only, including intentional interference with a business relationship and violation of § 1983.

The Bank and the individual officers filed demurrers, asserting that Gordon had not alleged facts sufficient to constitute a cause of action. In a memorandum and order entered May 13, 1997, the district court sustained the Bank's demurrer and dismissed the action against it based on a determination that Gordon could not establish an abuse of process claim, because he did not allege "a misuse of judicial process issued through a court of law." The court also sustained the individual officers' demurrer but granted Gordon leave to amend with respect to his alternative theories of recovery. Gordon filed a timely notice of appeal from this order.

### 2. CASE NO. S-97-1183

In this action, Gordon asserted claims against the individual officers and the state regulators. Although the Bank is listed as a defendant in the caption of Gordon's operative petition, no claim against the Bank is asserted. Based upon essentially the same facts as those alleged in case No. S-97-618, Gordon asserts claims against the individual officers and the state regulators based upon theories of abuse of process and violation of § 1983. The individual officers and the state regulators filed separate demurrers, which were sustained by the district court in an order entered on October 14, 1997. The court reasoned that the action constituted an impermissible collateral attack on the administrative order of the Department and the final judgment of the district court for Lancaster County dismissing the appeal from that order. Thus, the district court dismissed the action with prejudice and did not grant leave to amend. Gordon perfected a timely appeal, which was consolidated with case No. S-97-618 for oral argument and disposition. Pursuant to our authority to regulate the caseloads of the Nebraska Court of Appeals and this court, we removed the consolidated appeal to our docket on our own motion.

### IV. ASSIGNMENTS OF ERROR

Restated, Gordon assigns that the district court erred in (1) concluding that Gordon failed to state a claim for the tort of abuse of process and (2) concluding that his § 1983 action was barred by issue preclusion or as an impermissible collateral attack on an administrative judgment.

## V. ANALYSIS

### 1. CASE NO. S-97-618

#### (a) Claims Against Individual Officers

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Fitzke v. City of Hastings, ante* p. 46, 582 N.W.2d 301 (1998); *Bonge v. County of Madison*, 253 Neb. 903, 573 N.W.2d 448 (1998). In the absence of a judgment or order finally disposing of a case, an appellate court is without jurisdiction to act and must dismiss the purported appeal. *Future Motels, Inc. v. Custer Cty. Bd. of Equal.*, 252 Neb. 565, 563 N.W.2d 785 (1997); *State ex rel. Keener v. Graff*, 251 Neb. 571, 558 N.W.2d 538 (1997).

The district court sustained the individual officers' separate demurrer but granted Gordon leave to amend with respect to two of his three alternative theories of recovery. Our review of the record discloses no order of dismissal as to the individual officers, and this was confirmed by the parties in their joint response to an order to show cause which we issued following oral argument. The sustaining of a general demurrer, not followed by a judgment of dismissal terminating the litigation, does not constitute a reviewable final order. *Fox v. Metromail of Delaware*, 249 Neb. 610, 544 N.W.2d 833 (1996); *Barks v. Cosgriff Co.*, 247 Neb. 660, 529 N.W.2d 749 (1995). On the record before us, there is no order of dismissal terminating this litigation as to the individual officers, Chapin, Raum, Keslar, and Willnerd, and we therefore must dismiss the appeal as to those parties for lack of appellate jurisdiction.

#### (b) Claim Against Bank

As noted above, Gordon's claim against the Bank is based solely upon an alleged abuse of process. Our jurisprudence with respect to this cause of action is not extensive, and our most recent cases discussing it were decided more than 60 years ago. See, *Vybiral v. Schildhauer*, 130 Neb. 433, 265 N.W. 241 (1936); *Martin v. Sanford*, 129 Neb. 212, 261 N.W. 136 (1935). In *Martin*, we stated that the two elements necessary to establish an action for " 'malicious abuse of legal process' " are the existence of an ulterior purpose and an act in the use of the pro-

cess not proper in the regular prosecution of the proceeding. 129 Neb. at 222, 261 N.W. at 141. Quoting 1 Thomas M. Cooley, Torts § 131 (4th ed. 1932), we stated that " '[r]egular and legitimate use of process, though with a bad intention, is not a malicious abuse of process.' " *Martin*, 129 Neb. at 222, 261 N.W. at 141. We reiterated these statements in *Vybiral* and further noted: " ' "Abuse of process" . . . means the perversion of it,—i.e., accomplishing some illegal object or purpose for which such process was not legally intended.' " *Vybiral*, 130 Neb. at 437, 265 N.W. at 244, quoting *Dixon v. Smith-Wallace Shoe Co.*, 283 Ill. 234, 119 N.E. 265 (1918). We stated that "[t]o make out a cause of action for abuse of process, the plaintiff must prove irregular steps taken under cover of the process after its issuance, and damage resulting therefrom." *Vybiral*, 130 Neb. at 437, 265 N.W. at 244, citing *Italian Star Line v. United States Shipping Board E. F. Corp.*, 53 F.2d 359 (2d Cir. 1931).

Although the phrase "malicious abuse of process" appears in both *Vybiral* and *Martin*, we note that abuse of process is not synonymous with malicious prosecution; they are separate and distinct torts.

> " ' "In a malicious prosecution case, the necessary elements for the plaintiff to establish are: (1) The commencement or prosecution of the proceeding against him; (2) its legal causation by the present defendant; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; (6) damage, conforming to legal standards resulting to plaintiff.". . .' "

*Johnson v. First Nat. Bank & Trust Co.*, 207 Neb. 521, 526, 300 N.W.2d 10, 14 (1980), quoting *Schmidt v. Richman Gordman, Inc.*, 191 Neb. 345, 215 N.W.2d 105 (1974). Thus, "[a]buse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 121 at 897 (5th ed. 1984). Historically, the tort of abuse of process " 'evolved as a "catch-all" category to cover improper uses of the judicial machinery that did not fit

within the earlier established, but narrowly circumscribed, action of malicious prosecution. . . .'" *Younger v. Solomon*, 38 Cal. App. 3d 289, 296, 113 Cal. Rptr. 113, 118 (1974), citing *Italian Star Line, supra.* See, also, *Vybiral, supra* (citing *Italian Star Line, supra*).

Gordon's allegations focus on the two "Emergency Orders" issued by the Department on March 10 and 11, 1994, copies of which are appended to his operative petition. A demurrer reaches an exhibit filed with the petition and made a part thereof, so that a court can consider such exhibit in determining whether the petition states a cause of action. *Leader Nat. Ins. v. American Hardware Ins.*, 249 Neb. 783, 545 N.W.2d 451 (1996). The district court held that an abuse of process claim could not be predicated upon these administrative orders because "[t]o establish an abuse of process claim, Plaintiff must allege a misuse of judicial process issued through a court of law." Our review of this determination requires us to define, for the first time, the meaning of the phrase "legal process" in the context of an action for abuse of process.

In *Vybiral v. Schildhauer*, 130 Neb. 433, 265 N.W. 241 (1936), we cited and quoted Illinois cases defining the essential elements of abuse of process. Subsequent Illinois decisions on this subject define "process" as "any means used by the court to acquire or to exercise its jurisdiction over a person or over specific property." *Holiday Magic, Inc. v. Scott*, 4 Ill. App. 3d 962, 968, 282 N.E.2d 452, 456 (1972). "Process is issued by the court, under its official seal and must be distinguished from pleadings, which are created and filed by the litigants." *Doyle v. Shlensky*, 120 Ill. App. 3d 807, 816, 458 N.E.2d 1120, 1128, 76 Ill. Dec. 466 (1983). See, also, *Community National Bank v. McCrery*, 156 Ill. App. 3d 580, 509 N.E.2d 122, 108 Ill. Dec. 696 (1987) (stating that process is issued by court). Some jurisdictions define "process" more broadly to encompass the entire range of procedures incident to the litigation process, including various discovery documents, entry of defaults, and the utilization of various motions filed with a court. See, e.g., *Hopper v. Drysdale*, 524 F. Supp. 1039 (D. Mont. 1981); *Nienstedt v. Wetzel*, 133 Ariz. 348, 651 P.2d 876 (Ariz. App. 1982); *Foothill Ind. Bank v. Mikkelson*, 623 P.2d 748 (Wyo. 1981); *Twyford v.*

*Twyford,* 63 Cal. App. 3d 916, 134 Cal. Rptr. 145 (1976); *Younger, supra.* However, it is generally accepted that with respect to a cause of action for abuse of process, "the judicial process must in some manner be involved." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 121 at 898 (5th ed. 1984).

Gordon argues that we should expand the generally accepted definition of "legal process" to include process issued by an administrative agency acting in a judicial or quasi-judicial capacity. Our research discloses one case supporting this proposition. In *Hillside Associates v. Stravato,* 642 A.2d 664, 669 (R.I. 1994), the Supreme Court of Rhode Island held that a "misuse of an administrative proceeding may give rise to claims for malicious prosecution and/or abuse of process." The court limited its holding to "quasi-judicial contested administrative determinations or proceedings that establish the legal rights, duties, or privileges of a party" following notice and an evidentiary hearing resulting in a recorded decision. *Id.* Although recognizing the distinction between the torts of malicious prosecution and abuse of process, the court based its holding upon its "opinion that when a party invokes an administrative proceeding with malicious intent and without probable cause, that party should be subject to the same sanctions [t]hat would obtain if the action were brought in the judicial branch." *Id.* at 668-69. The Rhode Island court further stated that "numerous jurisdictions have recognized that misuse of certain administrative proceedings may give rise to claims for malicious prosecution and abuse of process," *id.* at 668, but most of the cases cited for this proposition involved only malicious prosecution claims and none reached the specific issue of whether an abuse of process claim could be based upon process issued by an administrative agency.

With the exception of *Hillside Associates,* the cases addressing this issue have held that process issued in an administrative proceeding cannot form the basis of an action for abuse of process. The most recent is *Kirchner v. Greene,* 294 Ill. App. 3d 672, 691 N.E.2d 107, 229 Ill. Dec. 171 (1998), in which the plaintiff asserted a claim for abuse of process based upon allegations that a newspaper article falsely accusing him of child

abuse resulted in the initiation of investigative proceedings by the Illinois Department of Children and Family Services. After reviewing the same elements of an action for abuse of process which we identified in *Vybiral v. Schildhauer*, 130 Neb. 433, 265 N.W. 241 (1936), and *Martin v. Sanford*, 129 Neb. 212, 261 N.W. 136 (1935), the court wrote:

> Kirchner's claim fails for the simple reason that no court process was involved and, thus, it is axiomatic that there can be no abuse of process. Kirchner recognizes this fact in urging us to expand the tort of abuse of process to include proceedings undertaken by the [Illinois Department of Children and Family Services] because it is a quasi-judicial administrative body that is charged with the responsibility of adjudicating claims of child abuse. Such expansion is baseless in the law and would be contrary to the narrow strictures to which courts have confined this tort.

*Kirchner*, 294 Ill. App. 3d at 684, 691 N.E.2d at 117, 229 Ill. Dec. at 181.

Similarly, in *Stolz v. Wong Communications Ltd.*, 25 Cal. App. 4th 1811, 31 Cal. Rptr. 2d 229 (1994), the court held that an allegation of misuse of the Federal Communications Commission broadcast licensing process failed to state a cause of action for abuse of process because no actionable abuse of judicial process was alleged. The court specifically rejected an invitation to extend the tort of abuse of process to administrative proceedings, noting that such action "would not serve the purpose of the tort, which is to preserve the integrity *of the court.*" (Emphasis in original.) *Id.* at 1823, 31 Cal. Rptr. 2d at 236.

In *Crosspoint Associates, Inc. v. Papas*, No. 941749, 1994 WL 878943 (Mass. Super. Nov. 7, 1994), the Massachusetts Superior Court cited to *Hillside Associates* and other authorities to hold that a nonmeritorious letter of complaint filed with the Army Corps of Engineers asserting violations of various environmental laws in an attempt to block a construction project could form the basis of a claim for malicious prosecution. However, the court rejected a contention that the complaint also stated a claim for abuse of process, finding that Massachusetts law "narrowly construed the parameters of an abuse of process

action" as applicable only to process issued by a court. 1994 WL 878943 at *3. Other cases reaching similar results include *Sea-Pac Co. v. United Food Workers*, 103 Wash. 2d 800, 699 P.2d 217 (1985) (holding that unfair labor practice charges could not form basis of action for abuse of process because no process was issued by Washington courts and that whether union misused process of National Labor Relations Board was for board to decide); *Char v. Matson Terminals Inc.*, 817 F. Supp. 850 (D. Haw. 1992); and *McCarthy v. KFC Corp.*, 607 F. Supp. 343 (D.C. Ky. 1985) (holding that employer's allegedly nonmeritorious resistance of appeal of unemployment compensation awards did not state claim for abuse of process because no judicial process involved).

We agree with the majority view that an action for abuse of process is historically based upon the need to protect the integrity of judicial process and should be narrowly construed to achieve that purpose. Accordingly, the district court did not err in sustaining the Bank's demurrer without leave to amend and in dismissing the action as to the Bank, based upon its finding that Gordon's allegations of abuse of administrative process failed to state a cause of action. In so holding, we do not decide whether or under what circumstances administrative proceedings could form the basis of an action for malicious prosecution, as those issues are not before us in this case.

## 2. CASE NO. S-97-1183

In this action against the individual officers and the state regulators, Gordon asserts two alternative theories of recovery: (1) abuse of process, based upon essentially the same factual allegations as those made in case No. S-97-618, and (2) deprivation of his constitutional rights, in violation of § 1983. The district court sustained the individual officers' and the state regulators' demurrers and dismissed the action with prejudice, finding that the order of dismissal entered by the district court for Lancaster County terminating the administrative proceedings was conclusive as to the claims asserted by Gordon in this action and could not be collaterally attacked. That order, however, is not part of the record. In his operative petition, Gordon alleges that the district court for Lancaster County "ultimately found the issue [raised in Gordon's appeal from the order of the

Nebraska Department of Banking and Finance] 'moot' as a result of the sale of the Bank, and dismissed Plaintiff's appeal without reaching a decision on the merits."

The doctrine of res judicata bars relitigation of a matter that has been directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) *the former judgment was on the merits*, and (4) the same parties or their privies were involved in both actions. *State on behalf of Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998); *Acosta v. Seedorf Masonry, Inc.*, 253 Neb. 196, 569 N.W.2d 248 (1997). The doctrine of res judicata is based on the principle that a final judgment on the merits by a court of competent jurisdiction is conclusive upon the parties in any later litigation involving the same cause of action. *Acosta, supra*; *Robertson v. School Dist. No. 17*, 252 Neb. 103, 560 N.W.2d 469 (1997).

The rationale of the district court is problematic, in that Gordon's petition specifically alleges that the judgment of the district court for Lancaster County was not on the merits, but, rather, resulted from a determination of mootness. See *McCartney v. Ford Motor Co.*, 657 F.2d 230 (8th Cir. 1981) (holding that judgment dismissing action as moot is not conclusive in subsequent proceeding). However, we need not resolve this question, because we determine that the dismissal of this action was justified for other reasons. A proper result will not be reversed merely because it was reached for the wrong reasons. *Smith v. Papio-Missouri River NRD*, 254 Neb. 405, 576 N.W.2d 797 (1998); *Klinginsmith v. Wichmann*, 252 Neb. 889, 567 N.W.2d 172 (1997). Where the record demonstrates that the decision of the trial court is correct, although such correctness is based on a different ground from that assigned by the trial court, the appellate court will affirm. *Pettit v. Paxton, ante* p. 279, 583 N.W.2d 604 (1998); *Boettcher v. Balka*, 252 Neb. 547, 567 N.W.2d 95 (1997). Our holding with respect to the abuse of process claim in case No. S-97-618 is dispositive of the similar claim asserted in this action. Gordon does not allege abuse of process issued by a court, and his petition therefore fails to state

facts sufficient to constitute a cause of action under this theory of recovery.

Although the states have concurrent jurisdiction to entertain § 1983 actions, as a result of the Supremacy Clause found in U.S. Const. art. VI, federal law is controlling and preempts any conflicting state law in determining these claims. *Felder v. Casey*, 487 U.S. 131, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988); *Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 680, 515 N.W.2d 401 (1994). In order to state a cause of action under § 1983, a plaintiff must allege facts establishing conduct by a person acting under color of state law which deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Gomez v. Toledo*, 446 U.S. 635, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980). Gordon alleges that the individual officers and the state regulators conspired to deny him procedural due process and violated his "constitutional right to practice in his chosen profession and liberty interest in his reputation and prospects for further employment." Gordon further alleges that the individual officers and regulators acted "with the intent to restrain Plaintiff's First Amendment rights to free speech (i.e., on banking issues) and free association (i.e., representation of banking interests)" in "retaliation for prior exercise of Plaintiff's First Amendment rights and to deter future exercise of said rights." However, the only factual allegations pertaining to conduct directed at Gordon by the individual officers and the state regulators are (1) the issuance of an emergency order by the Department requiring Gordon to cease and desist from "managing, controlling, directing, or otherwise interfering with any aspect of the ongoing business" of the the Bank and (2) the subsequent termination of the attorney-client relationship between the Bank and Gordon's law firm, as a result of which Gordon alleges to have "lost his position" with the firm. Gordon characterizes his claim as one alleging that "individuals working for the State of Nebraska and the United States Government conspired with private individuals to destroy

the reputation, professional standing, earning ability, and employment of Richard Gordon." Reply brief for appellant at 8.

We are aware of no authority recognizing a constitutionally protected right of a lawyer to represent a particular client or work for a particular law firm. Such relationships among private parties and entities are usually terminable at will or governed by contract. They do not constitute intimate human relationships or groups formed for the purpose of exercising First Amendment rights which are subject to a constitutionally protected freedom of association. See *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984). Gordon does not allege any form of public employment which would implicate his freedom of speech under the First Amendment. See, e.g., *Vinci v. Nebraska Dept. of Corr. Servs.*, 253 Neb. 423, 571 N.W.2d 53 (1997).

An injury to reputation by itself is not a liberty or property interest protected under the 14th Amendment. *Siegert v. Gilley*, 500 U.S. 226, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991); *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976); *Lynch v. City of Boston*, 989 F. Supp. 275 (D. Mass. 1997). Likewise, the loss of outside private employment does not come within the ambit of a constitutionally protected property interest. *Id.* In general, any damages for loss of employment opportunities that flow from harm to reputation may be recoverable under state tort law, but not under § 1983. *Siegert, supra.*

Construing the operative petition in a light most favorable to Gordon, we conclude it does not contain factual allegations sufficient to constitute a cause of action under § 1983, because it does not allege a deprivation of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. In addition, we conclude that this deficiency cannot be cured by amendment. Therefore, although for reasons different from those stated by the district court, we conclude that it did not err in sustaining the individual officers' and the state regulators' demurrers and dismissing this action.

## VI. CONCLUSION

For the reasons stated in case No. S-97-618, we affirm the judgment of the district court with respect to appellee

Community First State Bank of Nebraska but dismiss the appeal as to appellees Chapin, Raum, Kesslar, and Willnerd because of the absence of a final, appealable order necessary to confer appellate jurisdiction. The judgment of the district court in case No. S-97-1183 is affirmed.

JUDGMENT IN NO. S-97-618 AFFIRMED IN PART, AND IN PART DISMISSED.

JUDGMENT IN NO. S-97-1183 AFFIRMED.

WHITE, C.J., not participating.