DOROTHY CLAYPOOL, PERSONAL REPRESENTATIVE OF THE ESTATE OF CARLOS OLIVO, DECEASED, APPELLANT, V. TERRY HIBBERD ET AL., APPELLEES.

626 N.W. 2d 539

Filed May 25, 2001.   No. S-99-1223.

Larry W. Beucke, of Parker, Grossart, Bahensky & Beucke, for appellant.

William T. Wright, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Appellant, Dorothy Claypool, as personal representative of the estate of her son, Carlos Olivo, seeks damages for the wrongful death of Carlos against appellees Furnas County, Nebraska, and two of its law enforcement officers, Deputies Terry Hibberd and William Hoyt. Claypool seeks damages for Carlos' death under the Political Subdivisions Tort Claims Act and for damages for an alleged violation of Carlos' federal rights under 42 U.S.C. § 1983 (Supp. IV 1998). Appellees moved for summary judgment. The trial court found that the facts established by the evidence did not give rise to any cause of action against appellees and that appellees were entitled to judgment as a matter of law. This court removed this case from the Nebraska Court of Appeals under our power to regulate the caseloads of this court and the Court of Appeals.

## BACKGROUND

On the weekend of November 21 through 23, 1997, Claypool was going out of town to visit her husband who was working in Salina, Kansas. Claypool had three children: Melissa Olivo, age 13; Carlos, age 14; and Jesse Olivo, age 15, all of whom lived with their parents in Arapahoe, Nebraska. Claypool did not permit any of the three children to stay at home alone, but as long as two of the children were at home together, they could stay at home without an adult present. Claypool also left the children information on where she was staying, the telephone number to the motel, the telephone number to her cellular telephone, and various other contact and emergency telephone numbers.

Jesse already had plans to stay with a friend for the weekend. On Saturday, Carlos and Melissa called Claypool and asked her if they could each spend the night at a friend's house. Claypool gave permission for them to spend the night at their friends'

houses. After Carlos had obtained this permission, his friend was not able to have Carlos spend the night on Saturday night.

On Sunday, November 23, 1997, Hoyt, who was employed by the Furnas County Sheriff's Department, was on patrol in Arapahoe. At about 1:20 a.m., Hoyt observed two persons walk into an alley from between two buildings. When these two people saw Hoyt, one of them ran, and the other hid behind a tree. Hoyt told the person behind the tree to come out, and he was identified as Carlos.

Carlos told Hoyt he had taken some stereo equipment from a car. Carlos said the equipment that he had taken actually belonged to him. Carlos had given J.R. Utterback two speakers with the assumption that he was going to get paid by Utterback. Hoyt radioed for assistance, and Hibberd responded. After some investigation, members of the Utterback family identified the stereo equipment taken from the car. Utterback said that if Carlos would have asked for the speakers, he would have given them back. Thereafter, Hibberd, Hoyt, and Carlos went to Arapahoe's fire station where the sheriff's department had a satellite office. The deputies held Carlos under "temporary custody" and obtained a written statement from Carlos. They also inquired as to where they could find Carlos' companion who had fled. While at the fire station, Hibberd called Sheriff Hank Pulley and advised him of what had occurred. Pulley told Hibberd to cite Carlos for theft and release him. Pulley believed it to be a relatively minor crime.

Carlos told Hoyt that his companion, David Wendland, may have gone back to Carlos' house. Hoyt asked Carlos where his parents were, and Carlos said that his parents were out of state. Hoyt then asked Carlos if he had a telephone number or a way to contact his parents. Carlos responded that he did not, but that his parents were going to call him the next day. Hoyt and Hibberd took Carlos home to determine if Wendland might be there and to verify that Carlos' parents were not home. Neither Carlos' parents nor Wendland was at Carlos' home.

At this point, the deputies gave Carlos a citation, explained that his parents would have to appear on the designated court date, and then left Carlos at the residence. Both Hibberd, who has lived in rural Nebraska for 34 years, and Hoyt, who has lived

in western rural Nebraska his entire life, did not find it unusual or unreasonable in 1997 for the parents of a 14-year-old boy to leave the boy at home overnight without supervision.

Hoyt noted in his police report that Carlos "appeared slightly depressed with the situation." Both Hoyt and Hibberd stated in their affidavits that Carlos' slight depression was comparable to a person who had just received a traffic violation or a minor violation and had to inform his or her parents about the violation. The deputies stated that at all times Carlos was in their presence, he made no statement and demonstrated no action or demeanor which in any way indicated he was a danger to himself or others. Neither Claypool nor her husband was contacted by the Furnas County Sheriff's Department regarding Carlos, and they did not have any notice of these events until after Carlos' death.

Later in the morning on Sunday, November 23, 1997, an explosion and fire occurred at the Claypool residence where Carlos was living. After an investigation at the scene, it was determined that Carlos had died as the result of a self-inflicted gunshot wound to the chest. The State Fire Marshal investigator concluded: (1) Carlos was playing with a propane lantern in the garage and possibly was unable to get it lit at first; (2) Carlos left the valve open, allowing propane to escape, which eventually ignited and caused a flash which singed his face; (3) the gasoline vapors from a tipped-over can of gasoline ignited, causing other combustibles to ignite in the garage, or Carlos may have dropped the lantern or a candle which was burning, igniting the gasoline vapors; and (4) Carlos then went into the house, closing the garage door behind him, which allowed the fire to continue to build until the heat impinged upon the lantern tank, causing a large explosion of the compressed propane.

Carlos' body was found inside the house in the basement. Pulley concluded that all investigators involved in the case agreed that the gunshot wound was self-inflicted.

## ASSIGNMENTS OF ERROR

Claypool assigns that the trial court erred in finding (1) that there were no genuine issues of material fact as to whether appellees were liable for Claypool's damages under the Political Subdivisions Tort Claims Act and (2) that there were no genuine

issues of material fact as to whether appellees were liable for Claypool's damages under § 1983.

## STANDARD OF REVIEW

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Casey v. Levine, ante* p. 1, 621 N.W.2d 482 (2001); *McDonald v. DeCamp Legal Servs.*, 260 Neb. 729, 619 N.W.2d 583 (2000).

When an appellate court is deciding questions of law, the court has an obligation to resolve the questions independently of the conclusions reached by the trial court. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000).

## ANALYSIS

Claypool argues that the deputies were under a duty to immediately contact Carlos' parents and to release Carlos to his parents. Claypool asserts that this duty was created by Neb. Rev. Stat. § 43-250 (Cum. Supp. 1997) and the Furnas County Sheriff's Department's policy and procedure manual. Appellees contend that as a matter of law, the most appropriate option Hoyt and Hibberd had was the immediate release of Carlos under § 43-250(1) and (2) after conducting such "'reasonable efforts'" to contact Carlos' parents as circumstances allowed. Brief for appellees at 23. The deputies were thus required to balance what constituted "'reasonable efforts to contact'" under the circumstances against the mandate of "'immediate release.'" *Id.* Appellees assert that under the circumstances of this case, the extended custody of Carlos solely to contact his parents before he was released was not authorized by law.

A negligence action brought under the Political Subdivisions Tort Claims Act has the same elements as a negligence action against an individual, i.e., duty, breach of duty, causation, and damages. *Drake v. Drake*, 260 Neb. 530, 618 N.W.2d 650 (2000); *Brandon v. County of Richardson*, 252 Neb. 839, 566 N.W.2d 776 (1997). The threshold inquiry in any negligence action is whether the defendant owed the plaintiff a duty. *Drake v. Drake, supra.* Whether a legal duty exists for actionable

negligence is a question of law dependent on the facts in a particular situation. *Id.*

Claypool assigns as error the trial court's finding that there was no genuine issue of material fact under her first cause of action. The first cause of action in the second amended petition alleged that appellees were negligent in failing to follow the requirements of § 43-250, in releasing Carlos from their custody without making efforts to contact his parents, and in releasing Carlos from their custody without an adult present.

The pertinent part of § 43-250, entitled "Temporary custody; disposition," states in part:

An officer who takes a juvenile into temporary custody under section 43-248 shall immediately take reasonable measures to notify the juvenile's parent, guardian, custodian, or relative and shall proceed as follows:

(1) The officer shall release such juvenile;

(2) The officer shall prepare in triplicate a written notice requiring the juvenile to appear before the juvenile court or probation officer of the county in which such juvenile was taken into custody at a time and place specified in the notice or at the call of the court. The notice shall also contain a concise statement of the reasons such juvenile was taken into custody. The officer shall deliver one copy of the notice to such juvenile and require such juvenile or his or her parent, guardian, other custodian, or relative, or both, to sign a written promise that such signer will appear at the time and place designated in the notice. Upon the execution of the promise to appear, the officer shall immediately release such juvenile.

Neb. Rev. Stat. § 43-248 (Reissue 1998) provides:

A juvenile may be taken into temporary custody by any peace officer without a warrant or order of the court when:

(1) A juvenile has violated a state law or municipal ordinance in the presence of the officer;

. . . .

(3) A juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection;

(4) The officer believes the juvenile to be mentally ill and dangerous as defined in section 83-1009 and that the harm described in that section is likely to occur before proceedings may be instituted before the juvenile court[.]

Claypool's argument that appellees had a duty to contact Carlos' parents and release Carlos to his parents is premised entirely on § 43-250, the Furnas County Sheriff's Department's policy and procedure manual, and a "special relationship" pursuant to this court's decision in *Brandon v. County of Richardson*, 252 Neb. 839, 566 N.W.2d 776 (1997). In other words, Claypool does not argue that appellees are liable at common law, pursuant to the risk-utility balancing test this court has employed to determine the existence of a duty. See, *Knoll v. Board of Regents*, 258 Neb. 1, 601 N.W.2d 757 (1999); *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998). We consider, in turn, each of Claypool's asserted bases for the creation of the alleged duty.

We note that because of our resolution of these issues, we do not reach the question of whether Carlos' apparent suicide was a new and independent agency that broke the line of causation between his death and any negligence on the part of appellees. See *Long v. Omaha & C. B. Street R. Co.*, 108 Neb. 342, 187 N.W. 930 (1922) (holding that action for wrongful death may generally not be maintained where death was self-inflicted). See, generally, *Logarta v. Gustafson*, 998 F. Supp. 998 (E.D. Wis. 1998) (discussing history and scope of rule against tort liability for suicide).

## § 43-250

Claypool first argues that the parental notification provision of § 43-250 gave rise to a duty on the part of appellees to notify Carlos' parents that Carlos had been detained. A court may determine that a statute gives rise to a tort duty to act in the manner required by the statute where the statute is enacted to protect a class of persons which includes the plaintiff, the statute is intended to prevent the particular injury that has been suffered, and the statute is intended by the Legislature to create a private liability as distinguished from one of a public character. See, generally, Restatement (Second) of Torts §§ 286 to 288 (1965); 57A Am. Jur. 2d *Negligence* § 765 (1989); W. Page Keeton et al.,

Prosser and Keeton on the Law of Torts § 36 (5th ed. 1984). See, also, *Fimple v. Archer Ballroom Co.*, 150 Neb. 681, 35 N.W.2d 680 (1949) (adopting Restatement, *supra*, view).

■ Consideration of the Legislature's purpose in enacting a statute is central to the analysis of whether the statute defines a duty in tort. See, e.g., *Holmes v. Circo*, 196 Neb. 496, 244 N.W.2d 65 (1976) (Legislature did not intend dram shop act to create private cause of action); *Strauel v. Peterson*, 155 Neb. 448, 52 N.W.2d 307 (1952) (violation of act relating to livestock disease not intended by Legislature to create civil liability); *Frontier Steam Laundry Co. v. Connolly*, 72 Neb. 767, 101 N.W. 995 (1904) (ordinance requiring fireproof shutters not intended to create tort liability). Consequently, in order to determine whether the Legislature intended for § 43-250 to create civil liability or to guard against an injury such as that in the instant case, we consider the statutory purpose.

■ The U.S. Supreme Court has held that the Due Process Clause of the U.S. Constitution requires that a juvenile's parents be notified prior to proceedings that may result in the curtailment of the juvenile's freedom. See *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). Parental notification statutes, generally, are intended to furnish an additional safeguard to ensure that a juvenile's basic right to due process, as set forth in *In re Gault, supra*, is not violated. See *State v. Taylor*, 234 Neb. 18, 448 N.W.2d 920 (1989). See, also, *McDonald v. Black*, 820 F.2d 260 (8th Cir. 1987); *Rone v. Wyrick*, 764 F.2d 532 (8th Cir. 1985); *United States v. Doe*, 701 F.2d 819 (9th Cir. 1983); *United States v. White Bear*, 668 F.2d 409 (8th Cir. 1982); *United States v. Watts*, 513 F.2d 5 (10th Cir. 1975).

The history of Nebraska's parental notification requirement reflects consistency with this general purpose. When § 43-250 was enacted in 1981, it was a recodification of a previously enacted parental notification requirement. See, 1981 Neb. Laws, L.B. 346; Neb. Rev. Stat. § 29-401 (Reissue 1975). The previous statute, § 29-401, was enacted by 1972 Neb. Laws, L.B. 1403. The legislative history of L.B. 1403 reflects that the intent of Nebraska's parental notification requirement was not to create new rights or duties, but to institute a prophylactic measure to ensure that reasonable efforts were made to notify parents

before juveniles would be permitted to plead to any charges against them. See Minutes of Committee on Judiciary, L.B. 1403, 82d Leg., 2d Sess. (January 31, 1972); Floor Debate, 82d Leg., 2d Sess. 4775-76 (March 1, 1972).

In short, the intent of the statute was and is to ensure that a juvenile's due process rights are not violated by providing that parents will be notified after the juvenile is taken into custody. The potential injury contemplated by the statute is the violation of the juvenile's due process right to have his or her parents notified prior to a dispositional proceeding. The intent of the statute was not to protect juveniles from harming themselves after being released by law enforcement, nor is there any indication that the statute was intended by the Legislature to create a civil remedy for its violation.

Section 43-250 does not satisfy either of the final two criteria used to determine if a statute gives rise to a tort duty. The legislative history of the statute affirmatively demonstrates that the injury the statute was intended to prevent was not suffered by Carlos, and there is no indication in the statute or the legislative history that the statute was intended to create a private liability. As stated by the Supreme Court of Minnesota, "[p]rinciples of judicial restraint preclude us from creating a new statutory cause of action that does not exist at common law where the legislature has not either by the statute's express terms or by implication provided for civil tort liability." *Bruegger v. Faribault County Sher. Dept.*, 497 N.W.2d 260, 262 (Minn. 1993). See, also, e.g., *Letlow v. Evans*, 857 F. Supp. 676 (W.D. Mo. 1994); *Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998); *Freehauf v. School Bd. of Seminole Cty.*, 623 So. 2d 761 (Fla. App. 1993). We conclude that under the circumstances of the instant case, § 43-250 does not give rise to the duty alleged by Claypool.

### No Duty to Release Juvenile to Parents Under Sheriff's Department's Policy and Procedure Manual

Claypool argues that the Furnas County Sheriff's Department's policy and procedure manual created a duty requiring law enforcement officers to release persons under 18 years of age to their parents. Therefore, Claypool asserts that the deputies violated their own policy and, in doing so, breached their duty.

Appellees maintain that if a juvenile has been incarcerated and is released, the juvenile is to be released to his or her parents, but if a juvenile is taken into "temporary custody," cited, and released, the juvenile need not be released to his or her parents.

The relevant procedure is contained on page 64A of the Furnas County Sheriff's Department's policy and procedure manual, entitled "Release Prisoners on Bond." It states in pertinent part:

Any bailable defendant arrested for a misdemeanor on a charge other than felony, shall be released from custody pending a judgement on his personal recognizance, and any person under 18 years of age, shall be released to his/her parents to appear in court on a certain date unless the following circumstances exist:

1. The defendant may endanger himself or others if released.

2. Evidence exists that the defendant is likely to flee the jurisdiction or not appear in court as ordered.

Pulley interpreted this section to apply to someone under the age of 18 that has been arrested or incarcerated. If a juvenile has been incarcerated, then that juvenile is to be released to his or her parents. This would apply in circumstances such as a bonding-out situation. However, if a juvenile is taken into temporary custody and is cited and released, then that juvenile need not be released to his or her parents.

Pulley's interpretation of this policy is consistent with the language of the policy and with the situations to which the policy is to be applied. Carlos was taken into temporary custody under § 43-248(1). This statute states that "[a] juvenile may be taken into temporary custody by any peace officer without a warrant or order of the court when: (1) A juvenile has violated a state law or municipal ordinance in the presence of the officer." Neb. Rev. Stat. § 43-249 (Reissue 1998) states that "[n]o juvenile taken into temporary custody under section 43-248 shall be considered to have been arrested . . . ."

Given that the title of the policy is "Release Prisoners on Bond," it clearly does not apply to the situation regarding Carlos' temporary custody. According to § 43-249, Carlos was not under arrest and therefore was not subjected to any bonding-out procedures. Claypool's argument is without merit. No duty

was created by the department's policy and procedure manual to detain Carlos until he could be released to his parents.

Claypool failed to establish the existence of a duty to contact Carlos' parents and to detain Carlos until he could be released to them under either § 43-250 or the department's policies and procedures. Therefore, we conclude that Claypool has failed to establish the first element of a negligence case.

## PROTECTION FROM HARM

In her brief under her first assignment of error, Claypool argues that the cases of *Brandon v. County of Richardson*, 252 Neb. 839, 566 N.W.2d 776 (1997), and *Hamilton v. City of Omaha*, 243 Neb. 253, 498 N.W.2d 555 (1993), establish that a duty to protect Carlos from harm was created by the special relationship imposed on the deputies when Carlos was taken into temporary custody. Claypool asserts that this duty to protect was "magnified" because the deputies knew Carlos was depressed.

Claypool's first assignment of error states that the trial court erred in finding there were no genuine issues of material fact under Claypool's first and second causes of action. Claypool's third cause of action was the § 1983 action. Claypool's first and second causes of action alleged that appellees were negligent in failing to contact Carlos' parents, in failing to release Carlos to an adult, and in failing to follow the requirements of § 43-250. Claypool did not plead in her first or second cause of action that appellees were negligent in failing to protect Carlos from harm. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *Turney v. Werner Enters.*, 260 Neb. 440, 618 N.W.2d 437 (2000).

## § 1983 CLAIM

Claypool also brought a claim under § 1983, alleging that Carlos was deprived of his liberty as secured by the Due Process Clause of the U.S. Constitution. Specifically, Claypool argues that the Due Process Clause imposed a duty on state actors to protect or care for citizens when the state affirmatively placed a particular individual in a position of danger which the individual would not otherwise have faced.

█ In order to state a cause of action under § 1983, a plaintiff must allege facts establishing conduct by a person acting under color of state law which deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Gordon v. Community First State Bank*, 255 Neb. 637, 587 N.W.2d 343 (1998). A local government cannot be held liable under § 1983 solely because of injury inflicted by its employees or agents; rather, it can be liable only when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). See *DeCoste v. City of Wahoo*, 255 Neb. 266, 583 N.W.2d 595 (1998).

In *DeShaney v. Winnebago Cty. Soc. Servs. Dept.*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989), the Supreme Court held that the Due Process Clause does not impose an affirmative obligation on a state entity to ensure the safety of individuals. However, Claypool asserts the deputies did have a duty to protect Carlos from harm under the "creation of danger" exception recognized by the Court in *DeShaney*.

Under this exception, state actors may be liable if they affirmatively created the plaintiff's peril or acted to render him or her more vulnerable to danger. We understand Claypool's argument relating to this "creation of danger" exception to be that the deputies caused harm to Carlos by leaving him in a worse position than he was in before his temporary custody in that the deputies issued Carlos a ticket and then knowingly released a depressed youth alone in his parents' residence. Claypool concludes that any harm, including suicide, was foreseeable and that this harm was caused by the deputies. Therefore, Claypool asserts that this type of "creation of danger" situation applies in the present case to impose a duty on the individual deputies to protect Carlos.

Claypool cites the case of *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996), where the Court of Appeals for the Third Circuit suggested a test for applying the state-created danger theory. The four elements are as follows:

"(1) [T]he harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; [and] (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur."

The record reflects that Carlos' own friend, Wendland, who had known Carlos for many years, was not put on notice that Carlos might hurt himself. Wendland and his father spoke with Carlos approximately 2 hours after the deputies had left. In speaking with Carlos, Wendland stated that Carlos said he was scared and upset about being caught and getting a ticket because he knew he would get into trouble when his parents returned home. The trial court found, and the record supports, that Wendland and his father were not, as a result of their conversations with Carlos, put on any notice that Carlos was contemplating suicide or any other action that would be harmful to himself.

Both Hoyt and Hibberd stated in their affidavits that Carlos appeared to be only slightly depressed and of a demeanor comparable to a person who had just received a traffic violation or other minor violation who would then have to inform his parents of what had occurred and that Carlos, at all times while in their presence, made no statement and demonstrated no action or demeanor which in any way indicated he was a danger to himself or others.

We find that the deputies were not on any notice that Carlos was likely to commit suicide. As such, we conclude that his suicide was not a foreseeable harm caused by the deputies' actions. The facts are undisputed. Giving Claypool the benefit of every inference that could be drawn from the facts, we determine that the fact that the deputies talked with Carlos and issued him a citation was not an event of sufficient magnitude to place the deputies on notice that Carlos was likely to commit suicide. The deputies also did not place Carlos in any situation different than he was already in prior to his temporary custody.

Because the record establishes as a matter of law that Carlos' liberty rights under the Due Process Clause were not violated, we need not address whether the individual appellees were entitled to a qualified good faith immunity defense or whether there is

evidence of an official policy to support a § 1983 claim against Furnas County under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). See *DeShaney v. Winnebago Cty. Soc. Servs. Dept., supra.*

## CONCLUSION

For the reasons set forth in this opinion, we affirm the trial court's order sustaining appellees' motion for summary judgment.

AFFIRMED.